J. W. BRENNAN CONSTRUCTION COMPANY, Claimant, *v.* THE STATE OF NEW YORK.

## Claim No. 15747.

### (Court of Claims, December, 1921.)

*Contracts — for improvement of state and county highways — delay and interference with claimant's performance of work — burden of proof on claimant to rebut presumption that sand was properly rejected because inferior to accepted sample — award for damages arising solely because of state's default in placing a culvert.*

CLAIM for damages for breach of contract.

W. Smith O'Brien, for claimant.

Henry P. Nevins, deputy attorney-general (Charles A. Clark, deputy attorney-general, on the brief), for the State of New York.

CUNNINGHAM, J. The claimant entered into a contract with the state of New York for the improvement of a state and county highway in Chemung county, known as the "Erin-Van Etten-Spencer, part one, County Highway No. 1311," six and eighty-seven one-hundredths miles long, and extending east and west. The contract was dated August 30, 1915, and was executed by the claimant September 1, 1915, and

by the state September 17, 1915. It required the contractor to begin work within ten days and to complete the work on or before the two hundredth working day, which would be on or about November 15, 1916.

About three and nine-tenths miles from the west end of the road a ravine crossed the highway. The plans, part of the contract, provided for a concrete culvert six feet by eight feet at this point, "to be built by the town," over which culvert when built the claimant was required to deposit earth fill for a distance of about eighty feet and to a depth of twenty feet. On August 21, 1915, the town of Erin notified the state that the various bridges within its limits and in the route of the highway would be built, except the concrete culvert mentioned, the town contending it was unnecessary, and that an iron boiler three feet in diameter had sufficed previously under all flood conditions.

On September 17, 1915, the commissioner of highways, by letter, advised claimant that the right of way "has been acquired, the contract has been executed by the Commissioner and work upon the same can be started at once by you." On October 21, 1915, the state's engineer wrote to the claimant, "unless we find that you are prepared to start within the next week, I shall have to take up this matter with the department at Albany, * * * two-hundred working days are allowed you for the completion of this contract." The claimant then was ignorant of the position the town of Erin had taken. The claimant began performance on October 20, 1915, and during that month and November following delivered on the site of the contract the necessary plant and equipment. Much of the fill necessary was extensive and heavy and required the use of a steam shovel. This implement, weighing eighteen tons, began excavation at the east end of the road and worked westerly toward the ravine. There was ample time for the construction

52

of the culvert before the excavation so begun could progress to the ravine. The contract provided that the material to be deposited over the culvert must be taken from the highway on each side of it.

The orderly and proper method to progress the work required that the claimant obtain material to the east of the culvert to make a sufficient fill over it for the steam shovel to cross, and then to proceed with the work on the west side of the ravine. The claimant planned and prosecuted the work to that end, but when the shovel had progressed to the point east of the ravine from which material should be taken to make the fill over it, the culvert had not yet been built. This was on December 21, 1915, and only four days' excavation work for the shovel remained to be done between the point where it had arrived and the site of the culvert. Between September 17, 1915, and December 21, 1915, the claimant, at various times, had called the attention of the state's engineers to the imperative necessity that the culvert be built promptly and that failure to do so would impede the claimant. The latter was assured each time that it soon would be built. On December 21, 1915, the claimant suspended all operations and did not resume work until the following spring. Its reasons for doing so were two — unfavorable weather conditions because of which it preferred to suspend work, and the absence of the culvert which prevented further progress. Relying on the state's assurances, the claimant retained the shovel until July 1, 1916, at the east of the culvert, so that it might continue the work from that point. In June, 1916, impelled by the necessity for the completion of the culvert and the harassment resulting from its absence, the claimant itself attempted to build the culvert, being willing to assume the risk of obtaining compensation for it, but the state halted that work and prevented it being done. On July 1, 1916, the culvert not having been constructed, the

claimant transferred the shovel to the west side of the ravine by means of a detour and considerable effort and expense. This could not have been done by any reasonable process in the winter months because of the physical conditions prevailing. The steam shovel excavation to the west of the ravine was continued during the season of 1916 and completed in the spring of 1917, at which time the culvert had not yet been built, and the claimant being unable yet to make the fill at that point, sent the shovel to work on another contract.

The culvert was completed in July, 1917. The claimant thereafter was required to return the shovel to that point and complete the fill there, in August, 1917. The road was completed and accepted August 27, 1918.

Damages are sought in this proceeding,

(1) Because of the alleged delay and interference with claimant's performance of the contract because of the failure to provide it with the site of its work, through the omission to build the culvert at the proper time; and also,

(2) Because of the following facts: Written information furnished the claimant at the time it bid provided:

"REPORTS OF MATERIALS.

"*Sand*

"Sand, * * * taken from the property of Dwight Wolever, * * *. Reported plentiful. This sand is accepted for use in any class of concrete * * *.

"*Gravel*

"Gravel, * * * from the property of Dr. Canfield, * * * is accepted for use in second and third class concrete * * *."

The plans also provided: "Sand and gravel * * * shall be approved local materials from sources of supply located in the vicinity adjacent to the highway to be improved."

The contract provided: "Information will be furnished when available regarding location of accepted materials but the use of any materials will be permitted only so long as its quality remains equal to that of the accepted sample. In all cases the contractor will be required to satisfy himself as to the available supplies of materials and the relative location of the same."

The contract further provided: "The contractor further agrees, that he is fully informed regarding all of the conditions affecting the work to be done and labor and materials to be furnished for the completion of this contract, and that his information was secured by personal investigation and research and not from the estimates of the state commission of highways; and that he will make no claim against the state by reason of estimates, tests or representations of any officer or agent of the state."

Thereafter, the state rejected sand from Wolever property and claimant imported sand at an additional expense of $522.52. The amount of gravel found on the Canfield property was negligible and the claimant was obliged to procure it elsewhere at a cost of $649.56.

We will discuss the second phase of the claim first. There is a paucity of evidence of the circumstances under which the sand was rejected. There was no testimony that it was equal to the sample accepted. One of the claimant's officers testified that the state "again accepted the sand" after the work was done. The meaning of this is not clear. It may refer merely to sand from the same pit. Certainly it is not proof that identically the same sand, or sand of equal quality to that rejected, was accepted later for the same purposes. The right of the state to refuse to permit the use of sand inferior to the accepted sample is clear under the contract provisions quoted. It is elementary that the regularity and validity of official acts

are presumed, and the burden was upon the claimant to rebut the presumption that the sand was properly rejected because it was inferior, by appropriate evidence. It has not done so. Nor is there any liability for failure of the supply of sand or gravel at the locations indicated. The last contractual provision quoted obviates it. There is no evidence of lack of opportunity to the claimant to investigate fully the sources of supply, or of inequality or inequity. This identical provision was construed by the Court of Appeals in *Matter of Semper* v. *Duffey*, 227 N. Y. 151.

Judge Pound in his opinion rejected the claim of mutual mistake and gave full effect to the contractual phraseology, saying: " The statement was suggestive merely, directing him for inquiries to what the state considered the nearest available source of supply. The bidder had the same opportunity to discover the facts that the state had and he in his proposal agreed to execute a contract to the effect that he had availed himself of his opportunity and was content to make the proposal and to execute the contract upon the understanding that he was relying on his own personal investigation.

" We held in *Faber* v. *City of New York* (222 N. Y. 255, 260) that where the contractor had no reasonable opportunity to discover the truth as to the position of bed rock and the evidence was sufficient to show that the contract was made by both parties on the understanding that the bed rock was as indicated in the plan prepared by the city, the contractor might recover for extra work, but here the parties had entire equality of opportunity. \* \* \*. The proposal is made at the bidder's risk in these regards, certainly where no element of deception or inequality or inequity is presented. \* \* \* The result may seem harsh but the state properly protects

itself by the strictness of its contract and the relator must be bound by the terms thereof."

In defense to its alleged liability for damages due to delay in placing the culvert, the state contends that the building of this structure was imposed by law upon the town and the state was without power to built it, that the claimant made the contract "with its eyes open," with its knowledge of the law presumed, that for the town's omission it is not liable and that absence of the culvert, in fact, did not impede or damage the claimant.

The general obligation of a party to provide his construction contractor with the site for the work and to refrain from impeding its performance is not, and cannot be, denied. *Cross* v. *Beard,* 26 N. Y. 85; *Mansfield* v. *N. Y. C. & H. R. R. R.,* 102 id. 205. Quoting the latter opinion: " It is a well-settled principle of law in the construction of contracts that when the obligation of performance by one party presupposes the doing of some act on the part of the other prior thereto, that the neglect or refusal to perform such act not only dispenses with the obligation of performance by the other, but also entitles him to rescind, or when rescission will not afford him an adequate remedy, to continue the work and recover such damages as the delinquency has occasioned, against the defaulting party."

An important portion of the site was the culvert, and unless the alleged defenses interposed are meritorious, the failure to provide it was a breach of the contract. The Highway Law, section 2, subdivision 5, provides: "A highway * * * shall be deemed to include necessary *culverts,* sluices, drains, ditches, waterways, embankments, retaining walls, and all *bridges* having a span of *five feet or less.*" In section 120 it is provided that state highways " shall be constructed or improved at the sole expense of the state."

It will be noted that, by the statute, a " highway " expressly includes culverts and expressly excludes bridges of five feet or more span. The former are to be built by the state, the latter are not, and by other provisions of the Highway Law must be built by the town. In its transactions with the claimant and the town, and on the trial, the state contended that this structure was a bridge which the town was obliged to build. We do not agree. The plans designated the structure a " culvert." The dictionaries and technical authorities, as well as the decisions, recognize the distinction between culverts and bridges. Century Dictionary; *Proprietors of Bridges* v. *Hoboken Land Co.,* 13 N. J. Eq. (2 Beas.) 503, 511; *Board of Commissioners, etc.,* v. *Bailey,* 122 Ind. 46; *Oursler* v. *Balto. & Ohio R. R. Co.,* 60 Md. 358; *Cleveland* v. *Town of Washington,* 79 Vt. 498. The Century Dictionary defines a bridge as "Any structure which spans a body of water, or a valley, road, or the like, and affords passage or conveyance." It defines a culvert as " an arched or flat-covered drain of brickwork or masonry carried under a road, railroad, canal, etc., for the passage of water." This court in *Kerwin Construction Co.* v. *State of New York,* No. 13840, in which no opinion was written, recognized the distinction, and construed the term " highway " to include four culverts whose spans exceeded five feet. It is true that certain structures, particularly of masonry or concrete, having features of both, may be described as either bridges or culverts, but there is no difficulty in classifying this one as a true culvert. It had the structural essentials of a culvert. It did not span the stream; it was carried under the road, the fill over it being eighty feet long and twenty feet deep. The obligation to build it was on the state, not on the town. The state urges that the clause in the plans, " to be built by the town," determined the rights and obligations of the parties irre-

spective of the statute. This phrase was not effective to relieve the state from its duty to provide the site for the work. If it were so intended appropriate language could have been used. Our view is that neither this phrase, nor the legal obligation on the town to build the structure, if that obligation be conceded for the purpose of argument, relieved the state from its duty. The claimant had no relations with the town. The state, on the contrary, had ample opportunity to protect itself. It could have refrained from executing the contract until it had received the proper guaranties. The risk of the town's omission was on it, and not on the claimant. In addition, the state executed the contract, not only without assurances, but with full knowledge of the town's refusal, of which claimant was ignorant, and then compelled the claimant to begin the work. In *Lane Brothers Co.* v. *State of New York,* 11 State Dept. Rep. 117, the contract provided: "It is expected that the masonry abutments and superstructure necessary to carry the railroads over the canal prism together with so much of the excavation and backfilling as may be necessary therefor will be carried out by the railroad companies." The companies refused to do the work, the state failed to do it, the contractor thereby was denied the site for his operations and impeded, and Judge Haight, official referee, said: " It consequently follows that the State within a reasonable time was obligated to provide the contractor with the sites of the railroad companies, in order that it might perform its contract in excavating the prism of the canal thereunder. This the State has failed to do and, therefore, it became liable to the claimant for a breach of contract for the damage it has sustained by reason of such failure. * * *

" Under the provisions of the contract, as I have already shown, the State expected that the railroad companies would construct the bridges over the canal,

but this the companies failed to do. It, therefore, becomes the duty of the State to either construct the bridges or let contracts therefor.''

A somewhat similar proposition was involved in *Schunnemunk Construction Co.* v. *State of New York,* 116 Misc. Rep. 770. In that case the county failed to acquire the necessary rights of way before construction began, as required by statute. The contractor thus was denied the site for his work and his progress delayed. We held the state liable, saying: '' The issue is whether the state has violated the contract, by interfering with and interrupting the claimant in its performance of its obligation. Such interference between individuals or corporations confers a right of action. (*Mansfield* v. *N. Y. Cent., etc., R. Co.,* 102 N. Y. 205; *Del Genovese* v. *Third Ave. R. R. Co.,* 13 App. Div. 412; affd., 162 N. Y. 614.) * * * ''

'' We are not unmindful of the statutory provisions above referred to, but the claimant had no power or function in that connection. It was the duty of the county to procure the right of way, and of the state to satisfy itself in that respect before directing the claimant to proceed. This was a matter between the state and the county, and the state could use its own means to assure, protect and inform itself, before ordering claimant to begin work. No question of ignorance of law as an excuse is involved here.''

The only remaining question is one of fact. The absence of the culvert very seriously delayed and damaged the claimant. It was not reasonably possible, or practicable, for the claimant to move its shovel around the ravine in the winter of 1915–1916. That inquiry is of little importance, anyway. The claimant was entirely justified in keeping the shovel on the east side of the ravine, in position to resume work when the culvert was completed, relying as it did, and had a right to, upon the repeated assurances of the state

that it soon would be in place. Claimant was not obliged to assume their assurances to be worthless and to expend the considerable sum and effort required to make the detour. We find, however, part of the damages for delay, for which recovery is sought, was not the result of the state's breach of the contract, but was the fault of the claimant. An award is made in the sum of $23,893.25, being the damages suffered by the claimant solely because of the state's default.

ACKERSON, P. J., concurs.

Ordered accordingly.