Grandview Construction Corp., Claimant, *v.* State of New York, Defendant.   (Claim No. 30384.)

Court of Claims, August 31, 1953.

*Wolfgang E. Cribari* and *Walter B. Solinger, II,* for claimant.

*Nathaniel L. Goldstein, Attorney-General (James G. Austin* and *Edward L. Bookstein* of counsel), for defendant.

YOUNG, J. Claimant corporation contracted with the State of New York to reconstruct 1.72 miles of the Unionville-McKeels Corners State Highway, No. 52, and the Knollwood-Hawthorne State Highway, No. 1570, in Westchester County.

The contract was executed on July 15, 1948, and it called for completion of the work by December 31, 1948. The claimant was instructed by letter dated July 19, 1948, to commence work immediately.

Upon assembling its equipment on the jobsite to start the work, claimant found the right of way over which the proposed reconstruction was to run obstructed by telephone and power poles, as well as residences in which people were still living.

While the claimant was aware at the time of entering into the contract that it could expect the presence of these obstructions at the time it commenced work, still it had every right to expect, under the plans and specifications, that negotiations by the State with the owners of the obstructions would have progressed far enough so that at the time of commencement of the work the buildings could then either be razed or removed to other locations. As it was, instead of negotiations with the owners being completed, they had been barely initiated.

Bearing in mind that the completion date called for by the contract was December 31, 1948, the following is a list of the obstructions on the jobsite and the date on which each obstruction was finally removed.

| DESCRIPTION | DATE REMOVED |
|---|---|
| Barn, LeRoy Brown | January 7, 1949 |
| Refreshment Bldg., B. G. Alpern and others | May 23, 1949 |
| 2 story frame house, John P. Ahearn | March 28, 1949 |
| 1½ story frame house, Earl A. Price | February 23, 1949 |
| 2 story frame house and garage, William R. Lang | March 7, 1949 |
| 2 story frame house and garage, Everette Cowan | March 8, 1949 |
| 2 story frame house, David Cowan | March 3, 1949 |
| Telephone and light poles, station 297 to 315 | { Tel. poles, Nov. 4, 1948 { Light poles, Nov. 17, 1949 |
| Telephone and light poles, station 347 to 367 | February 18, 1949 |
| Telephone and light poles, station 372 to 385 | February 18, 1949 |
| Telephone poles and cables, A line | March 7, 1949 |
| Telephone poles and cables, R. R. line 0±00 | March 7, 1949 |

The rock excavation called for by the contract was impeded because there were telephone cables and poles, which had to be removed, lying immediately in front of the rock, making it impossible to proceed with the blasting operation.

The large bulk of earth excavation in the north end of the project was in a considerable part impeded because the people were still living in their houses. Since the total length of the cut in the north end was not available, the contractor was not provided with sufficient earth to make the fills required in the south end.

It is this court's opinion that if the contractor had been presented with the unimpeded site it had every reason to expect, the various categories of the contract could and would have been performed by December 31, 1948. As it happened the contractor was forced to make repeated protests to the State and, in consequence, the State granted a series of extensions until the completion date was brought up to December 31, 1949.

Because the jobsite remained obstructed over the expected period of the contract and beyond, the contractor was required to make constant revision in its operating plans. Its antici-

pated progress schedule became only a memory of a fond hope. Machinery brought to the job to do work was forced to sit idle day after day, unless it could be utilized on the Elmsford project, an adjacent construction job successfully bid in by the claimant. Although there was a ready market for the rental of such machinery, the contractor could not risk renting it because, under the constant revision of plans, it never knew for any appreciable time in advance when it would be required on the present contract. Further, the contract required the presence of the machinery on the jobsite in advance of the time it would start work.

This court's opinion of the situation thus created has been well expressed by G. A. Flewelling, Senior Lands and Claims Adjuster, in a letter written under the signature of the District Engineer to the Director of the Bureau of Rights of Way and Claims. '' This is the first time occupied residences have seriously interfered with a contractor's work in this district, but the situation on this project is a perfect example of what can easily happen on any project where there are a large number of occupied buildings on the rights-of-way, and no prior arrangements have been made with the property owners, regarding adjustment of their claims and the manner of clearing the buildings from the rights-of-way is unsettled. To avoid such complications, it appears that rights-of-way negotiations should be undertaken many months in advance of the advertising of contracts for projects involving many buildings; particularly occupied residences.''

The State, by failing to act diligently in clearing this jobsite, has made itself liable to the claimant for its damages. (*Wright & Kremers* v. *State of New York*, 263 N. Y. 615.)

The damages herein may be grouped under three headings: Item I, the rental value of the equipment for the time rendered idle by the breach; Item II, the increased expenses of the changed plan of operations made necessary by the obstructions; Item III, additional payroll and personnel expense.

Under Item I, the claimant has shown twenty-eight pieces of equipment brought on the job. To establish a monthly rental rate, the claimant, from its books and records, has made proof of the following items for each piece of equipment: date of purchase, purchase price, annual depreciation, repairs and overhaul, taxes and insurance, interest and storage costs. percentage of operating costs.

The monthly rental rates thus established were then compared with the rates then current in the industry, as well as the rates established by the Office of Price Stabilization, and were found to be substantially the same, if not lower. The court finds such rental rates to be the proper measure of damages. (*Barford Contr. Co.* v. *State of New York,* Claim No. 23350, not reported.)

From its books and records, the claimant then made proof of the daily activity of each piece of equipment from the time it came on the job until it left the job or could be said to have been employed on the job on a regular basis. Deducted from this total number of days were the days on which the equipment worked either on the present job, or the Elmsford job, as well as Saturdays, Sundays, holidays, rainy days, a single idle day occurring between two working days or a working day and a Saturday, Sunday or a holiday. Thus did the claimant arrive at what the court believes to be a fair estimate of the days rendered idle by the breach.

The value of the idle time was computed by simply multiplying the net time idle by the monthly rate.

(Portion of opinion here omitted as being of subordinate importance.)

Under Item I, the rental value of the equipment for the days rendered idle by the breach, the claimant has been damaged in the amount of $85,163.

Not only did the claimant show that the equipment was rendered idle for a great many days, but it also made proof, under Item II of the damages, that when equipment did work it was forced to work in some cases less, and in most cases more, than was originally anticipated because of the changed schedule of operations made necessary by the presence of the obstructions on the jobsite.

Under Item II, the claimant proved the planned cost of operating each item of equipment and the actual cost by multiplying the number of days by the daily expense of operating each piece. The last figure was established by adding to the daily rental rate the equipment operator's wages.

(Portion of opinion here omitted as being of subordinate importance.)

The difference between the planned and actual cost is $13,875, in which amount the claimant has been damaged under Item II for increased expenses made necessary by the change of operations.

The court appreciates that in so computing damages it is accepting claimant's own figures on its anticipated cost and that in large construction contracts there is often considerable variance, through hazards encountered in the trade, between the planned and actual cost. The court is obliged to adopt this method for a number of reasons. Contractors, if they are to remain long in business, must become expert in analyzing job requirements and breaking them down into units of cost. The planned cost herein was taken ultimately from the itemized figures submitted by the claimant in its bid and therefore certainly not in anticipation of litigation. Further, the State offered no evidence to contradict claimant's figures. Its excuse that such contradicting evidence is difficult if not impossible to obtain is fatuous.

Under Item III, claim is made for payroll and personnel expense caused through the necessity of keeping certain men on the job while the equipment was there, despite the fact that the equipment was idle.

The positions held by these men and their weekly salaries are as follows:

Equipment manager ............................$90
Master mechanic ..............................125
Grade foreman ................................ 85
Office manager ............................... 85

Claim is made and the court finds that these four men were on the job at least three months longer than would have been necessary if the job had proceeded in the manner originally anticipated.

No claim is made, nor has one been allowed, for labor charges for the equipment operators themselves since these men were laid off when the equipment was not working.

The court awards damages under this item in the amount of $6,960.

The claimant completed work on the contract by December 31, 1949, and claimant's performance was finally approved and accepted by the State by order of the Department of Public Works dated January 20, 1950.

The final estimate, dated April 1, 1950, showed $29,941.73 concededly due the claimant, which amount was awarded claimant by a judgment of this court, paid on January 26, 1951, with the question of interest on said amount being reserved for the trial of the instant claim.

The court awards the claimant interest on $29,941.73 from April 1, 1950, to the date of payment after the entry of judgment on that amount, namely, January 26, 1951.

The court makes further awards to the claimant as follows: Item I, $85,163; Item II, $13,875; Item III, $6,960; being a total award of $105,998, with interest thereon from April 1, 1950, to date of the entry of judgment.

Award is made in an accompanying decision.