Alexander Del Giorno, J.
This is a claim to recover damages for breach of a highway contract known as Contract No. PIP 56-1, RC 56-6, entered into between Johnson, Drake & Piper, Incorporated (hereinafter referred to as J. D. P.) and the State of New York. The contract, dated March 8, 1956, was for the *305 construction of a portion of the Palisades Interstate Parkway in Rockland County in accordance with certain plans of the Department of Public Works dated January 2, 1951. The original completion date of the contract was September 1, 1957. The contract provided for the construction of 3.40 miles of roadway, and about 2 miles of intersecting and access roads, in addition to seven bridge structures.
Subsequent to the award of the contract, claimant J. D. P. entered into a subcontract with claimant Smith Construction Company of New Rochelle and Pelham, Inc. (hereinafter referred to as Smith) under the terms of which Smith agreed to perform all of the Item 2BX unclassified excavation and Item 7 trimming, in addition to furnishing water equipment and applying water. The State approved of Smith as a subcontractor on May 4, 1956.
J. D. P. and Smith, on December 1, 1958, entered into a “liquidating agreement ”, whereby J. D. P. admitted liability to Smith for certain claims for additional costs incurred under the subcontract, and both agreed that any liability of J. D. P. to Smith would be liquidated by the presentation of Smith’s claim to the court.
On or about March 10, 1956, claimant J. D. P. entered upon the performance of the contract. The original completion date of September 1, 1957 was extended by the State to October 15, 1957 without the imposition of engineering charges and further extended to December 19, 1957 with the imposition of engineering charges incurred after October 15, 1957. The contract was completed on December 17, 1957, three and one-half months after the date originally set for completion, and was formally accepted by the State on January 13, 1958. Thereafter the Department of Public Works submitted to J. D.P. a final estimate and agreement, certifying payment of the total amount of $2,413,479.81, less payments on account in the sum of $2,310,454.78 leaving a balance due and owing of $103,025.03. On December 19, 1958, J. D. P. returned the final estimate and agreement, together with its verified statement of claim. By letter dated January 28, 1959, the State submitted a Revised Final Agreement certifying for payment the total amount of $2,413,479.90 less payments on account of $2,310,454.78, leaving a balance due and OAving of $103,025.12. On January 29, 1959 J. D. P. returned the Revised Final Estimate and Agreement, together with its verified statement of claim.
. On April 2, 1959, the Comptroller forwarded a check in the sum of $99,396.29, representing the admitted balance under the *306 contract less the sum of $3,628.-83 deducted by the State for engineering charges. This check was returned to the Comptroller immediately.
On April 9, 1959 the within claim was filed, and on April 14, 1959, J. D. P. moved for a severance. An order of severance was entered, and the severed portion was tried. Judgment was entered in the sum of $99,396.29, which was paid on May 25,1959.
The items of damage of J. D. P. and the bases thereof will be considered herein separately.
J. D. P. claims it is entitled to recover the amount of $67,329.28 which it alleges is the increased cost and expense incurred by it because of the prolongation of the contract from September 1, 1957 to December 17, 1957, due to the acts and interferences of the State, with interest from January 17, 1968; engineering charges, with interest from January 17, 1958; 5% overhead and profit on amounts recovered by'Smith with interest from January 17,1958; interest on severance judgment from January 17, 1958 to May 25, 1959; interest on amount of interest on severance judgment from May 25, 1959.
J. D. P. contends that when the contract was entered into, it anticipated the construction by its own force of seven bridge structures and miscellaneous items, and by Smith of general excavation or trimming work. 'Smith was to perform work in connection with the building of detour roads and all excavation work necessary to facilitate the construction of the bridges by J. D. P. J. D. P. estimated that, allowing for a “ cushion” for contingencies such as strikes or bad weather, all of its contract work would have been completed two and one-half months prior to the contract completion date of September 1, 1957. A proposed progress schedule was prepared by J. D. P. on May 2, 1956, upon which it based its bid. The completion date of all work and all structures is shown as of June 30, 1957.
On June 26, 1957, all of the bridge structures had been completed. On September 1, 1957, which was the original completion date, the items of work which remained unperformed were the removal of earthwork at Marycrest Road and at the Erie Railroad detour, the completion of the borrow at the south end of the project and some miscellaneous clean-up items which were dependent upon the completion of the removal of Mary-crest Road and the Erie Railroad detour. At that time, no work remained to be done by J. D. P’s. own work force except the miscellaneous items which depended on the clean-up by subcontractor Smith. All of the work remaining to be performed was to be performed by Smith.
*307 Claimants contend that if they had been able to excavate Marycrest Road, the Sickletown detour road and the Erie Railroad detour without the interference of the State, the contract would have been completed by September 1, 1957; that because of those problems and the delay in being granted permission to obtain the necessary borrow in the south end of the job, it was impossible to complete the work prior to December 17, 1957.
In July, 1957, claimants requested permission to borrow material from an off-site borrow pit in the southern end of the job. The use of this borrow pit was granted orally by Mr. Rauer, a District Engineer, and in writing on July 10,1957. Mr. Bain, Resident Engineer, reversed this order and refused permission to use this borrow pit. Marycrest Road and the Erie detour were turned over to claimants on September 20, 1957. On November 1, 1957, Mr. Bain finally gave permission to claimants to go into the borrow pit. Claimants then borrowed 7,000 cubic yards of material and placed it in the Convent Road area. The removal was completed on November 9, 1957. Claimants contend that they were unable therefore to complete the contract even in November.
The Marycrest Road situation concerned an existing unpaved dirt road which crossed the proposed highway at approximately station 412. Marycrest Road was not indicated on the contract plans, except that on Sheet 3 thereof appear two lines crossing the highway at this station, between which lines appears the designation “ R.O.W. ’ ’ When claimants made a site investigation, they saw a dirt road leading to houses in the Marycrest area, and that this road crossed the highway right of way and went down to Sickletown Road.
The contract provided that a “Marginal Road ” be constructed, which apparently was to tie into Marycrest Road running in a north-south direction from Townline Road, west of the highway to be built. The plans set forth certain specifications as to the marginal road. Although Marycrest Road did not appear on the drawings, it was apparent that the existing Marycrest Road was the sole means of access to Marycrest homeowners. Claimants assumed that the marginal road would tie into Marycrest Road. Claimants anticipated that they could remove the portion of Marycrest Road crossing the highway right of way, hereinafter called the Marycrest Plug, in the normal course of operations, particularly since the contract was silent as to traffic maintenance. At a job site meeting in April, 1956, State’s Resident Engineer, Mr. Bain, told claimants that it was important to build the marginal road so that the *308 residents of Marycrest area would have access. Claimants contend that it was assumed by claimants and the State that the marginal road would extend to Marycrest Road and that as soon as the marginal road was completed the plug could be removed.
After the completion of the preliminary clearing and after the final stake-out of the marginal road was made and construction of it started, claimants discovered that the marginal road was 200 feet short of Marycrest Road. In an ensuing discussion, Mr. Bain stated that the responsibility for the connection was that of the Marycrest residents. Accordingly, claimants discussed the matter with them. .Since they evinced no interest in paying for the extension of the road in order to progress his contract, Smith agreed to continue the construction of the marginal road free of charge, from the end of the State’s right of way to Marycrest Road. This work was completed by the first week of August, 1956, at which time there was access from Marycrest Road to Townline Road. From that time, the Mary-crest people used this road in going west on Townline Road, but continued to use the Marycrest Plug in going to Sickletown Road on the other side.
In August, 1956, claimants requested Mr. Bain’s permission to excavate the Marycrest Plug, pointing out that the marginal road and the Townline access road were built according to contract requirements and were superior to the original condition of Marycrest Road. Mr. Bain refused permission because of complaints of Marycrest residents. With Mr. Bain’s knowledge and of their own volition, claimants approached the residents seeking their approval of the removal of the plug. At their request, and as no part of claimants’ contract work with the State, claimants did several days’ bulldozer work in the Marycrest development for no compensation. Then a representative of the residents requested claimants to build a children’s playground, and threatened that if claimants refused, the residents would not agree to use the marginal road and would complain to the .State if claimants removed the Marycrest Road material. Claimants nevertheless refused to do this further work. Later the Marycrest residents complained to the State, and Mr. Bain refused permission to remove the Marycrest Road material.
The Marycrest plug was about 20 feet on an average higher than the grading of the finished highway. This interfered with the operation north of Townline Road where fill was needed, and in view of the State’s refusal to permit its removal, Smith constructed a haul road from station 405 to station 422, a road *309 about 1,700 feet long, going along the top of the slope to the west side of the parkway with a gradient coming down to the parkway right of way at stations 405 and 422, so that the fill might be obtained.
The removal of the plug was refused by the State until the ■ latter part of September, 1957, Mr. Bain stating only that the Marycrest residents did not want it taken out until the last possible moment. In August, claimants had attempted to remove some of the material in small lots but were stopped by the town police. Mr. Bain testified that claimants were under obligation to furnish access to people living adjacent to the highway even though the contract notes set forth the roads wherein Item 76 (“ Maintenance of Traffic ”, in the General Specifications) would apply, and even though Marycrest Road was not mentioned in the notes. He maintained that Item 76 did not have to mention specifically the roads on which traffic would have to be maintained, but would have to mention merely certain areas where two-way traffic would have to be maintained. The Attorney-General admitted, however, that it was not the understanding of the State that the plug would have to remain across the highway right of way. Mr. Bain admitted that if he were bidding, he would not infer from the contract that the plug was to remain during construction. He testified that when the contract was entered into, he believed that the plug would have to remain across the highway right of way until the contractor had provided the extension of the marginal road to Marycrest property.
The State provided for permanent paved linkage between the end of the marginal road and Marycrest Road on May 31, 1957, under Supplemental Agreement No. 5. The State had received a letter from the attorneys for the Marycrest property owners (State’s Exhibit E), wherein the property owners released the Palisades Interstate Parkway Commission and gave permission to build a linkage from the marginal road to Marycrest Road. The Attorney-General admitted that after the contract had been entered into it was found that the State had not obtained an easement across the property of one Burck, which would be the area across which the marginal road ordinarily would be built to Marycrest Road. Thereafter, however, the State decided to build the permanent connection covered by Supplemental Agreement 5, the plans for which were approved on May 31, 1957. No evidence was offered as to a relationship between the construction of the paved road and State’s refusal to permit the removal of the plug by claimants.
The State contends that the Marycrest plug could not have been removed until claimants had completed the connection *310 of the marginal road with Marycrest Road and further that if the claimants had commenced and completed the work during early June, 1957, under Supplemental Agreement No. 5, the Marycrest problem would not have been a factor in the delay.
Another factor to be considered is the Erie Railroad question. The existing tracks of the Erie crossed the proposed highway at about station 401. One of the bridge structures to be built under the contract was a permanent railroad bridge, upon which tracks would be placed. While claimant was building a permanent bridge structure on the center line of the railroad, railroad traffic was to run across a detour to be built. After the detour was built, the railroad was to place track on the detour, the parkway at the site of the existing line of the railroad was to be excavated to grade, the bridge was to be constructed, the tracks were to be placed back on the completed bridge structure and the detour road was to be removed. The work of putting the tracks on, changing railroad communications lines onto the detour road and then replacing them on the completed bridge structure was to be performed by the railroad and was not part of the contract.
Although claimants had expected to commence construction of the bridge in late Summer of 1956 and to complete it by late April, 1957, they began work in early Fall of 1956 and completed the bridge on June 26, 1957. The completion date was delayed because of a strike in the Rockland County area.
Claimants allege that the State met with difficulty in obtaining the co-operation of Erie. The railroad wanted no work performed in 1956, since it did not want to use the detour during the Winter and did not wish to have the railroad bridge until the following year. In the Fall of 1956, when claimants had completed the detour road, Erie refused to lay its tracks on the detour. Regardless of the delays encountered because of the actions of Erie, claimants completed construction of the bridge in late June, 1957, prior to the completion date of the contract. Erie refused to remove its tracks from the detour and to place them on the completed bridge structure until September 19, 1957. Because Erie continued to have its tracks and communications systems set up on the detour, claimants could not remove the material which constituted the road. The detour was not released to claimants for removal until September 20, 1957 with the result that until that time claimants were unable to excavate the detour grade and embankment. From June, 1957 to September, 1957, claimants registered many complaints with the State relative to this situation. Mr. Bain was of the *311 opinion that the bridge was completed and ready for the installation of track in July, 1957, but did not act on the complaints. The State had paid the entire contract price for the construction of the bridge and listed it as 100% complete in its own progress reports for July, 1957. The State, however, took no action whatever with respect to Erie. When the detour was released finally, excavation of an underlay of rock on the detour was begun which took about 31 days to complete, or until about November 9, 1957. There remained some cleanup items and the placing of borrow at the south end of the job.
The State argues that if claimants had started construction of the bridge in July, 1956, instead of the Fall of that year, this problem would not have contributed to the three and one-half month extension. The State claims that claimants failed to ■ prove by expert testimony that Erie should have been satisfied with the work performed before September, 1957.
The third question involved is that of the Sickletown Road detour. At the time of the negotiation of the contract, Sickle-town Road was an existing road crossing the proposed highway at approximately station 394. A highway bridge had to be built at the location of the existing road, and the contract provided for a detour road to be built to the south of existing Sickletown Road, to handle traffic while the structure was under construction. The detour was to cross the proposed highway at approximately station 392. Sheet 92 of the contract plans indicates drainage culverts to be placed under the detour road to carry any ground or surface waters away from the main line of the highway. The drainage was to consist of two corrugated metal pipes to carry away the water, which were to be 18 inches in diameter and to be placed at two low points on the terrain, fill material then to be placed atop them.
Contract drawing 92 indicates also the right of way necessary for and presumably obtained by the State for the creation of the Sickletown detour road. In April, 1956, claimants met with the State concerning the detour road, and were informed that the State had failed to obtain the necessary easements as shown on sheet 92 to allow the detour to be constructed in accordance with the plans. Claimants awaited State’s obtaining the necessary easements or otherwise obviating the problem caused by the fact that insufficient land had been obtained. After some negotiation, and on May 24, 1956, Mr. Bain delivered to claimants a revised diuwing of the detour road, representing an attempted solution by the State of the problem by moving the detour to the north side of the existing Sickletown Road, instead *312 of the south side, rather than by obtaining the necessary easements. Apprised of the location of the revised detour, claimants spoke to Mr. Bain concerning the failure of the revised drawing to provide for any drainage facilities, pointing out that unless drainage were provided, there would be a damming of water in the area. Mr. Bain refused to authorize drainage for the road because the cost of excavation for the drainage would be considerable. On the original detour road, since there was no culvert and drainage excavation, the drainage would have been paid for under Item 2BX, but because of the high grade of the proposed highway at the new location, a trench would have to be dug from the top of the ground down to the elevation of the new highway and would have to be paid under Item 5.
Between June 22, 1956 and August 9, 1956, when Smith entered the Sickletown area to excavate, work of excavation had to be abandoned by reason of the fact that the material was too wet to permit any work in' the area and the machines were becoming stuck. Claimants were ordered to abandon the area and not to return to it until the material was in condition to move and place in an embankment, which was more than one year later. Actually the wet material in the area could not be removed until August, 1957. This prevented claimants from completing their work in this area and prevented the movement of all the material to other contract locations. Mr. Bain admitted that although the original contract plans called for the building of the detour road on the south side of existing ■ Sickletown Bo ad and provided for complete drainage of the detour embankment which would have to be constructed, this detour road was shifted by the State to the north side of existing Sickletown Bo ad, without provision for drainage. He explained that if the State had permitted drainage of the revised detour road, the contractor would have had to excavate from the top of the ground elevation down to ,the lowest point of the proposed grade of the new highway in order to drain it, and that this would have been a distance of about 15 feet of trench excavation which would have had to be paid for under Item 5 of the contract.
The State’s answer to this is that it is always the responsibility of the contractor to provide temporary drainage of his work and that this is a “no pay” item, citing Public Works Specifications of January 2, 1951, page 182-b: “Ditching and Grading. The Contractor shall provide and maintain slopes, crowns and ditches on all excavations and embankments to ' insure satisfactory drainage at all times.”
*313 Un the trial, claimants moved to conform the pleadings to the proof, which motion was granted, so as to reflect the claims of J. D. P. and Smith as follows:
1. Marycrest Road — increased cost of handling 14,000 cubic yards of excavated material from south of Marycrest Road up and over the 20-foot barrier of said road, to complete the fill for the swamp area to north................ $4,149.60
2. Increased costs incurred in excavátion and grading operations by reason of refusal of State to permit removal of Marycrest Road after September 5, 1957................... 5,760.00
3. Increased costs incurred by reason of delayed removal of Marycrest Road and disposal of material in remote areas.................. 4,318.13
4. Increased cost and damages incurred by reason of change of plans of detour for Sickle-town Road Bridge........................ 12,382.13
5. Increased cost and damage incurred by reason of misrepresentations in contract documents of quantity of material available and necessity of performance of grading work under revised methods and use of borrow material for construction of embankment and fills ..................................... 85,531.95
6. Increased costs and damages incurred by reason of prolongation of work period beyond original contemplated time................. (This is combined claim, allocating $14,901.05 for Smith and $67,329.28 for J. D. P.) 82,230.33
7. Damages incurred by deduction of engineering charges .............................. 3,628.83
Total................................ $198,000.97
The court has already alluded to the arguments of the State with specific reference to Marycrest Road, Erie Railroad and Sickletown Road. In general, the State contends also that considering the size of the within contract and the amount involved, the period of three and one-half months is of comparative insignificance; that claimants must prove that the accrual of the extra period was directly and exclusively caused by the acts of the State; that the proof does not establish the factors caused solely by the State were responsible for the additional time *314 required to complete the contract, and that .any one, or a combination of any of the factors involved not caused by the State could have led to a prolongation of the time required to complete the contract; that even if the State had been responsible for some of the delay factors, there were so many other factors involved that it is impossible to find that there would not have been a prolongation in any event.
A contractor is entitled to a reasonable opportunity to perform the contract without obstruction or interference, and the State is liable for failure to furnish such opportunity unless the State had relieved itself of such liability by express language in the contract. The obligation to furnish the contractor with an unobstructed site for his operations is an implied covenant in every building and construction contract. (Town & Country Eng. Corp. v. State of New York, 46 N. Y. S. 2d 792, citing Mansfield v. New York Cent. & Hudson Riv. R. R. Co., 102 N. Y. 205, Del Genovese v. Third Ave. R. R. Co., 13 App. Div. 412, affd. 162 N. Y. 614, Cross v. Beard, 26 N. Y. 85, Guerini Stone Co. v. Carlin Constr. Co., 248 U. S. 334, Schunnemunk Constr. Co. v. State of New York, 116 Misc. 770, Brennan Constr. Co. v. State of New York, 117 Misc. 816.) In the Town & Country case, the court held (p. 800): “ Permitting others to occupy the site to the exclusion of the contractor is a failure to furnish such site and opportunity for carrying out the provisions of the contract. Del Genovese v. Third Ave. R. Co., supra; John Johnson Const. Co. v. State, 211 App. Div. 512, 207 N. Y. S. 570; Rogers v. City of New York, 71 App. Div. 618 76 N. Y. S. 1029, affirmed 173 N. Y. 623, 66 N. E. 1115; Thilemann v. City of New York, 82 App. Div. 136, 81 N. Y. S. 773. Delays and obstructions in violation of that implied covenant are non-actionable only if they are within the contemplation of the parties at the time the contract is made and that contemplation involves such delays as are reasonably foreseeable, arise from the contractor’s work itself during performance or .those specifically mentioned in the contract. [Cases cited.] However, no delays are contemplated which would prevent the completion of the work within the time fixed by the contract unless it is expressly so provided. ['Cases cited.] ”
Commenting upon various delays on the part of the City of New York, the court held further (p. 804):
“ The City of New York procrastinated with its installation of the new mains and finally completed the same on January 8, 1934. The State’s neglect to procure the proper expedition of such work by the City continuously hampered the claimant’s progress and caused it added expense and cost in its operations.
*315 ‘ ‘ The provisions of the general notes, specifications and plans merely indicated to the claimant that the work of the subway contractor and the City of New York would make it impossible to carry on certain features of claimant’s work in continuous sequence and the State would see to it that their work would be coordinated with that of claimant so as to complete the work by May 1, 1933. The Water Department and the subway contractor were permitted by the State to so operate to the exclusion of the claimant as to disrupt the sequence of the latter’s operations during the completion period and their continued appropriation of the site prevented the completion of the contract during that time. Nothing in the contract afforded them such right and it clearly was not within the contemplation of the parties at the time the agreement was made.
‘1 The delayed removal of the pre-existing structures and barriers and the retarding activities of the subway contractor and the City of New York restricted the operations of the claimant and its subcontractors, rendering their equipment idle during the period of suspension, necessitating the employing of special equipment, methods, and materials and prolonging unreasonably and unnecessarily the performance of the work at an increased cost of such work, overhead and insurance. The State having breached its agreement, it should be held to respond for damages.”
The Marycrest situation arose because a necessary right of way had not been obtained. The State could have obviated the problem caused by the failure to obtain the easement between the marginal road and Marycrest Road, either by compelling the Marycrest residents to provide for their own access or by appropriating a portion of the Burck property or the Marycrest land and building thereon a connecting link. The Marycrest owners, however, prevailed upon the State to permit the removal of the plug only at the very end of the work.
In the case of Grandview Constr. Corp. v. State of New York (204 Misc. 389) completion of the work involved by the contract date became impossible because necessary casements had not been obtained. The court held that negotiations by the State with the owners of the obstructions would have progressed far enough so that at the time of the commencement of the work the buildings could either be razed or moved to other locations, whereas in fact negotiations with the owner had been barely initiated. The count held further (pp. 391-392):
“ The large bulk of earth excavation in the north end of the project was in a considerable part impeded because the people were still living in their houses. Since the total length of the *316 cut in the north end was not available, the contractor was not provided with sufficient earth to make the fills required in the south end.
“It is this court’s opinion that if the contractor had been presented with the unimpeded site it had every reason to expect, the various categories of the contract could and would have been performed by December 31, 1948. As it happened the contractor was forced to make repeated protests to the State and, in consequence, the State granted a series of extensions until the completion date was brought up to December 31, 1949.
“ Because the jobsite remained obstructed over the expected period of the contract and beyond, the contractor was required to make constant revision in its operating plans. Its anticipated progress schedule became only a memory of a fond hope. Machinery brought to the job to do work was forced to sit idle day after day ”.
The court held that the State was liable to claimant because it had failed to act deligently in clearing the jobsite, citing Wright & Kremers v. State of New York (263 N. Y. 615).
The fact that the claimants made a site inspection of Mary-crest Road does not justify the State in refusing claimants a clear site for their work. (A. W. Banko, Inc. v. State of New York, 186 Misc. 491.)
The State is chargeable with knowledge that under the existing circumstances, a bidder could not have discovered any inaccuracy of the State’s representatives either as to quantities or as to easement rights. The State’s engineers had had a long-period of time in which to discover the true situation, and should have taken proper steps to remedy it. (John Arborio, Inc. v. State of New York, 41 Misc 2d 145.)
The court finds that claimants were not provided with the clear and unimpeded site to which they were entitled, that the State did not co-ordinate the progress of the work properly and did not perform its obligations in a reasonable manner.
As to Sickletown Road, the State had failed to obtain a necessary right of way. Instead of acquiring the property, the State chose to redesign the detour in another location, and in doing so, omitted necessary drainage. In furnishing plans and specifications to a contractor, an owner warrants their adequacy, suitability and fitness, and injury caused by the omission of a necessary feature of the design must be borne by the owner. (MacKnight Flintic Stone Co. v. Mayor of City of N. Y., 160 N. Y. 72; Seglin-Harrison Constr. Co. v. State of New York, 267 App. Div. 488, affd. 293 K Y. 782.)
*317 With respect to the Erie Railroad question, the railroad, as the agent of the State, could not require claimants to do any more than the State would demand under the contract. The railroad bridge was completed in accordance with the contract terms, and the railroad should have laid down tracks within 21 days thereafter. It was the responsibility of State’s Resident Engineer Mr. Bain to determine if the bridge was ready for tracks. State’s contention that even though its own representatives were satisfied that the work was performed properly, nevertheless the railroad had to be satisfied, is not tenable. Delay in making a determination as to completion or approval as to performance is compensable. (Thomas v. Fleury, 26 N. Y. 26, 34; Litchfield, Constr. Co. v. City of New York, 244 N. Y. 251.)
It is to be noted that the State has not introduced evidence to contradict the proof of damages by claimant, and accordingly the claimants’ method of proof and measure of damages are accepted (Arc Eng. Corp. v. State of New York, 40 N. Y. S. 2d 354, affd. 293 N. Y. 819 ; Johnson v. State of New York, 5 A D 2d 919).
The court finds that it was improper for the State to assess the sum of $3,628.83 for engineering charges and to deduct it from the final payment. The Standard Specifications (pp. 13, 14) govern the imposition of engineering charges, and provide that such charges will be assessed “ in cases where the work has been unduly delayed by the contractor because of unwarranted reasons, inefficient operations, or for any other reason for which the Department determines the contractor liable.” The court has found that the various delays in the completion of this contract were caused by the State which breached its contract with claimants. In the proper exercise of discretion by the State, there should have been no imposition of engineering charges. (Town & Country Eng. Corp. v. State of New York, supra; Good Roads Eng. & Contr. Co. v. State of New York, 176 Misc. 1012; Pallette v. State of New York, 266 App. Div. 490, affd. 292 N. Y. 657; Delaware Paving Co. v. State of New York, 31 N. Y. S. 2d 51, affd. 265 App. Div. 889.) In addition, there has been no proof by the State of the reasonableness of the amount of the deduction. The claimants are entitled to recover the amount of the charge which was imposed.
It is to be noted that the claim as amended on the trial includes 5% profit to J. D. P., as follows: On Olaim No. 1, the sum of $197.60; on Claim No. 3, the sum of $205.63; on Claim No. 4, the sum of $589.63; on Claim No, 5, the sum of $4,072.95, all of which claims are characterized as extra work claims. Claimant maintains that although the 5% was referred to in the claim as *318 “ profit ”, its clear intention was to include “ overhead ” therein as well as profit. Obviously, in view of the breach of the contract by the State, the supervision costs and other overhead costs increase. The court finds that J. D. P. is entitled to the said percentages on recovery by Smith in the specified claims.
The court, however, is of the opinion that a reasonable period for the State to complete its final estimate in this large contract would have been some three months.
Accordingly, the court awards the claimants herein the sum of $202,749.90 to be allocated between the two claimants herein as follows :
To Johnson, Drake and Piper, Inc.
For increased costs and damages incurred by reason of the prolongation of the contract. (Claim No. 6.)............................. $67,329.28
For engineering charges deducted by the State from the final payment..................... 3,628.83
For overhead and profit on Claims No. 1, 3, 4, 5.. 5,065,81
Interest on severance judgment from March 15, 1958 to May 25,1959........................ 4,748.93
Total................................. $80,772.85
with interest on the said sum of $67,329.28 from March 15, 1958 to the date of entry of judgment; interest on the said sum of $3,628.83 from December 17, 1957 to the date of entry of judgment ; interest on the said sum of $5,065.81 from March 15, 1958 to the date of entry of judgment; and interest on the sum of $4,748.93 from May 25,1959 to the date of entry of judgment.
To Smith Corporation Company of New Rochelle and Pelham, Inc.
For increased costs of handling excavated material from south of Marycrest Road up and over barrier, to complete fill for swamp area to north. (Claim No. 1.)...................... $3,952.00
For increased costs in excavating and grading operations by reason of refusal of State to permit removal of Marycrest Road after September 5, 1967. (Claim No. 2.).......... 5,760.00
For increased costs incurred by reason of delayed removal of Marycrest Road and the necessity of disposing of material therefrom in remote areas over circuitous and extended haul distance. (Claim No. 3.)...................... 4,112.50
*319 For increased costs and damages resulting from excavation of 13,250 cubic yards of material from highway right of way, north of relocated Sickletown Road bridge detour, because of water conditions in Sickletown Road area created by relocation of said detour and refusal of State to authorize installation of proper drainage. (Claim No. 4.)............ 11,792.50
For increased costs and damages sustained by reason of misrepresentation in contract of quantity of material available and existing within grading limits of proposed highway and the necessity of performance of grading work under revised methods and the use of borrow material for construction of embankment and fills. (Claim No. 5.)....................... 81,459.00
For increased costs and damages incurred by reason of prolongation of contract. (Claim No. 6.) 14,901.05
Total................................. $121,977.05
with interest on each of said sums from March 15, 1958 to the date of entry of judgment, the total amount of the awards to both claimants being the sum of $202,749.90, with interest as aforesaid.