Henry W. Lengyel, J.
This is a claim for damages arising out of a certain contract executed on August 17, 1959' by the claimant and the State of New York. The contract was known as Contract No. FASH 59-12 for the construction of approximately 0,9 of a mile of highway along Route 28 in the Village of Herkimer, New York.
The claimant generally seeks the following damages: (a) $9,640.69 caused by the failure of the State to provide a clear site and to undertake acquisition of the necessary right of way with due diligence; (b) $2,000 for removal of three sections of railroad track from the right of way; (c) $500 for construction of drainage ditches under railroad track sections as replaced; (d) $1,800 for construction of three temporary wooden railroad crossings required as a result of the delay in obtaining right of way and removal of said railroad tracks; and (e) $14,165, less a credit of $8,365 already paid under a supplemental agreement, or $5,800, for removal of 16,730 cubic yards of woódíbark and scraps from right of way on the project and for purchase, transportation and filling the same with approved fill.
The State concedes the claim for extra work caused by removal of the railroad tracks from the right of way and the court, therefore, awards the claimant the sum of $1,529.95.
The State also concedes the claim for damages caused by the construction of drainage ditches under railroad track sections and the court, therefore, awards the claimant the sum of $581.10. It should be noted that the Attorney-General stipulated at the trial that the damages occasioned here were $581.10 as opposed to the amount stated in the claim and we consider the claim amended to reflect this stipulation.
The State further does not oppose the claim for damages for the construction of three temporary wooden crossings caused by the failure of the railroad to remove its tracks. There was testimony by the claimant and by the State that an average of one hour each for two men each day would be needed to maintain and repair these crossings. The court awards the claimant the sum of $1,800 as damages for construction and maintenance of these three temporary wooden crossings.
On June 23, 1960, one Mr, Reile, a tenant of the owner of part of the land appropriated for the construction, removed a structure situated upon the right of way. Additional work, which is conceded by the State, was encountered by the claimant *1059 in this area because Mr. B-eile did not leave said area in the condition it was before he removed the structure. The claimant’s superintendent, Mr. Wielt, testified that it took some men and a fiat-bed truck around two to three hours to clear this land, The court believes that $25 is a fair sum for this additional work.
In addtion, the State concedes there was a delay caused by the falure of the Department of Public Work to provide a job site for the claimant. Mr. Kellogg, the State Associate Lands and Claims Adjuster for District 2, Utica, testified that negotiations for acquiring the land at the job site did not begin until August, 1959, According to claimant’s contract, it was to begin work within 10 days of its signing, or by August 24,1959, The plans prepared by the State were completed on April 22, 1959 and maps of the project were filed with the Secretary of State in June, 1959, which filing allows the State or its subagents the right to enter the land for the purpose of clearing and grubbing, but nothing more.
In order for the contractor to proceed further than grubbing and clearing the land, the State must first acquire title to the land or execute a working agreement with the landowner. Acquiring title is accomplished by simply filing copies of the appropriation maps in the office of the Clerk of the county in which the property is located and the office of the Secretary of State. The record is void of any reason as to why these appropriation maps were not filed shortly after they were prepared in the Spring of 1959, or certainly before the contract with the claimant was executed. The delay in filing was certainly one of the causes of the failure of the State to provide a job site for the contractor. As a matter of fact, Mr. Kellogg testified that title to Hubbard property was not acquired until after October, 1959, nearly two months from the signing of the contract, and title to the New York Central property was not acquired until June, I960 or 10 months thereafter.
The court holds that the State by failing to act diligently in making this job site available has made itself liable to the claimant for damages. (Wright & Kremers v. State of New York, 263 N. Y. 615; Grandview Constr. Corp. v. State of New York, 204 Misc. 389; Johnson v. State of New York, 5 AD 2d 919.)
As a basis for computing damages caused by idle equipment the State relied upon the “ Contractor’s Equipment Ownership Expense ” manual (CEOE). That manual states at page 3 under the heading Daily Equipment Expense: “ Since the idle time of equipment is taken c:are of by a factor in the monthly expense, no such, factor should be used in computing a daily rate. The daily rate is derived simply by dividing the monthly *1060 rate by thirty. When a machine is charged to a job on a daily basis the rate should be charged for each calendar day without deductions for Sundays, holidays, or other idle time during the period it is assigned to the job.”
The claimant relied upon the ‘ ‘ Associated Equipment Distributors ’ ’ manual (AED) in computing damages. That manual also states that the monthly rates should be divided by 30 to figure the daily rate indicating to the court that, unless the proof indicates otherwise, Saturdays, Sundays and holidays should be included in the computation if they are part of a consecutive period. The court finds that each day, regardless of Saturday, Sunday, or holiday, should be counted as part of a consecutive period of use in computing the daily compensation for use of the contractor’s equipment. If these days were not counted, then the monthly rate should be divided by the average number of working days each month, i.e., 22 days, to arrive at a daily rate. This daily rate is of course much higher but used over a number of weeks should not vary too much from the other method. It would, however, have a great effect on the idleness for single days. The court believes that the method followed herein is practical and equitable.
The State contends that the period of delay extends from September 7,1959 to September 30,1959, exclusive of Saturdays and Sundays or a total of 18 days. The claimant contends that the delay runs from September 7, 1959 to October 6, 1959. State’s Exhibit E, a letter from its engineer in charge, Mr. Reagen, to the District Engineer in Utica, indicates that the claimant was authorized to resume work on October 1, 1959. Claimant’s job diary, prepared by its superintendent Mr. Wielt, states at the notation for Thursday, October 1, “ Rained all day wasn’t able to work.” This indicates to the court that the claimant chose not to work on this day because of the inclement weather rather than the failure of the State to provide a job site. The court holds that it was the claimant’s choice not to resume work on October 1, 1959 because it was raining and therefore the State should not be held responsible for any delay after September 30, 1959. We find a total delay period of 24 days.
The court next comes to the question of the appropriate damages to be assessed against the State for its failure to provide a jo'b site whereat claimant would be able to perform under the contract. It is elemental that damages dannot be recovered in. excess of the actual damages sustained. (France & Canada S.S. Corp. v. Berwind-White Coal Min. Co., 229 N. Y. 89.)
*1061 In almost all cases touching upon the question of the damages for allowing equipment to remain idle, the State has failed to produce any proof to the contrary or even object to the proof submitted by claimant as to the fair and reasonable rental value of such equipment. The courts have therefore said that they are bound by the damages shown by the claimant. (See Immick Co. v. State of New York, 251 App. Div. 919; H. L. Baughman, Inc. v. New York State Thruway Auth., 30 Misc 2d 1002; Town and Country Eng. Corp. v. State of New York, 46 N. Y. S. 2d 792; Brogan v. State of New York, 109 N. Y. S. 2d 97; Turner Constr. Co. v. State of New York, 253 App. Div. 784, mod. 279 N. Y. 243; Garofano Constr. Co. v. State of New York, 183 Misc. 1080.)
However, in this case, the State has introduced into evidence an alternative method of computing the measure of damages and the court is given the opportunity of examining another method of assessing damages. This method is based on the CEOE manual, which contains the contractor’s estimated expense of maintaining a piece of equipment rather than what a suggested rental should be. The CEOE manual estimates for a particular piece of equipment the annual percentage of its initial cost which should be charged for: (1) depreciation, (2) major repairs and overhauling, (3) interest on investment, (4) storage, incidentals and equipment overhaul, (5) insurance, and (6) taxes. It does not include loading, shipping, erecting, operating and dismantling, nor does it include fuel, lubricant supplies, wages or transportation of operating crews or any of the contractor’s general expense of doing business. The foreword to this manual makes it very clear that the rates therein are intended as a guide only and are subject to variables such as weather conditions, job location, length of construction season, type of work, care of equipment, and method of accounting. The percentages given therein are only based on averages of equipment costs to the owner and the individual experience of the owner may vary this figure somewhat. The CEOE manual was not intended to give rental rates but rather acts as a guide for a contractor not in the business of renting machinery. After an average annual amount is computed for the six items numbered above, it is divided by the average number of months the equipment is used each year. In the case before us, eight months’ use is assumed which we feel is reasonable for this part of the country. The resulting figure is a percentage of the total cost of the equipment that is calculated to be its expense to the owner each month.
*1062 The claimant, on the other hand, contends, as have many claimants in the past, that the court should use the rates suggested by the AED manual as the fair measure of damages. It is stated in the foreword of this pamphlet that81 it is published for the information and convenience of equipment distributors [emphasis supplied by the court] and others who may have use for such information.” The rates therein “ are an average rental rate among approximately 800 equipment distributor [emphasis supplied by the court] member firms.” Throughout the foreword is used the term “ rental rates ” suggesting to the court that this booklet was intended primarily for equipment distributors rather than contractors.
The claimant herein is concededly not an equipment distributor, but rather a contractor in the construction business. It uses the equipment in its own business and did not, nor did it intend to rent this equipment to others. What may be a fair return to a contractor may not be ia fair return to a distributor. A distributor runs the risk of many different individuals using the same piece of equipment, thereby possibly shortening its useful life as a piece of rental equipment, which, among other variables, may account for the higher rates. The practical applicability of the CEOE expense figures becomes strikingly apparent when one makes a comparison between the two approaches. For example, the AED manual lists the rental of a $250- — -24-inch cut, gasoline chainsaw to be $141 per month, whereas the CEOE lists the expense of owning and maintaining said saw for one month as only $18.50. Assuming a rental of 2 months for the chainsaw, the owner will have recovered his cost and then some, if he charged the rates recommended in the AED manual. Also assuming a rental for 8 months of the HD-21 at $3,564 per month and at $2,031 per month for the D-7 for 8 months, the owner would receive $28,512 and $16,248, respectively, or nearly the total cost of the HD-21 and over one half the cost of the D-7 dozer. This compares with recovery of cost in about 2 years using the CEOE manual. Even if the court adds an amount for overhead and profit the recovery of cost by using the CEOE manual is ¡still more realistic for a contractor than that given in the AED manual. The period of recovery of initial investment using the AED manual rates seems unusually short to the court. The court believes that it is better able to fairly determine the amount of damages .by using the contractor’s ownership expense and adding to this figure an amount for overhead and profit. We, therefore, adopt the method employed by the CEOE manual and propounded by the 'State in the case at hand.
*1063 It is conceded that there was an HD-21 bulldozer, a D-7 bulldozer and a 24-inch cut, gasoline chain saw idle during the delay caused by the defendant. The cost of the HD-21 bulldozer including accessories was $37,326.52 and applying the expense rate of 5.8% per month, the court figures the expense for 24 days to be $1,731,84. The D-7 bulldozer cost $29,071 and at expense rate of 5.8% per month, the court figures the expense for 24 days to be $1,348.80. The claimant is entitled to $13.60 for the idleness of the chainsaw for the 24 days. Under the circumstances, the court considers the addition of 10% for overhead (and 10% for profit a fair return for the contractor. (Frye v. State of New York, 192 Misc. 260.) The court computes the expense of these three pieces of equipment using the CEOE manual to be $3,094.24 to which it adds overhead and profit of 20% and therefore makes a total award of $3,713.08 to the claimant for this item.
The claimant also seeks damages for the delays on October 6, 1959 when Mr. Hubbard prevented work for approximately three hours and for the delay on June 11, 1960 when Mr. Eeile prevented work for another three hours. These delays were occasioned because the State failed to act diligently in clearing this job site, and therefore the State has made itself liable to the claimant for its damages. (Wright & Kremers v. State of New York, 263 N. Y. 615, supra; Bianchi & Co. v. State of New York, 17 A D 2d 38, supra.) We find damages of $109.20 for October 6 and $170.10 for June 11.)
The claimant makes a further claim for damages because it was unable to use its heavy equipment during the days it was building the wooden crossing, viz.: September 3, 4 and October 2, 5 and 6, 1959. This claim-was substantiated by the notes recorded in the job diary of the claimant. It was necessary for the heavy equipment to cross -the railroad tracks before the remainder of the land could be cleared. The only way around, other than directly over the tracks, was to load this equipment on flat trucks and then transport it to the nearest permanent crossing, and then back to the job site. There was testimony that the nearest permanent crossing was some distance from the job site ¡and that it would have been too cumbersome and time-consuming to run the equipment to the other side in that manner. -Since the State is not contesting the cost of building the temporary crossings, it should not object to compensating the claimant for its damages resulting from not being able to cross the tracks. These damages are predicated on the amount of time claimant’s equipment was idle. Claimant’s diary shows that one crossing was completed *1064 on October 2, 1959, therefore, the claim for October 5 and 6, 1959 is disallowed since the equipment could have crossed the tracks at this point without having to wait until the other crossings were constructed. The court computes the damages therefor to be as follows:
September 3, 4 HD-21 Bulldozer (at $86.60 per day)
and (includes 20%) ................... $259.80
October 2, 1959
D-7 Bulldozer (at $74. per day)
(includes 20%)................... 222.00
Chainsaw (at $0.74 per day)........ 2.22
TOTAL ......................... $484.02
Finally we come to the question of the damages incurred as a result of encountering woodbark upon the job site. There was no indication in the contract, proposals, specifications or plans that woodbark would be present at the job site. The State admits the presence of 7,150 cubic yards of woodbark which was removed by the claimant and that it was replaced by 8,580 cubic yards of fill borrowed from a nearby gravel pit. The woodbark operation was accomplished between October 12 and 21, 1959. The State and claimant bilaterally executed a supplemental agreement on the 18th day of June, 1960, wherein the State agreed to pay the claimant 50 cents per cubic yard for the woodbark removed and the fill borrowed to replace it. The claimant accepted payment of $7,865 under item 2, unclassified excavation, of the contract for 15,730 cubic yards of material involved in the woodbark operation, pursuant to the supplemental agreement. The claimant now contends that it is not now bound by the supplemental agreement and that it should be allowed to make an additional claim in this court for additional costs it incurred in removing the said woodbark. The supplemental agreement was signed by both parties with full knowledge of the costs involved. If the claimant’s costs for removal of the woodbark were in excess of that specified in the supplemental agreement, then it could either have reserved in the isupplemental agreement its right to bring a claim in this court for the alleged additional costs, cf. Poirier & McLane Corp. v. State of New York (13 Misc 2d 858); or, not execute the supplemental agreement and bring a claim in this court. Claimant elected to execute the supplemental agreement and we hold that it is bound thereby. We dismiss the claim for damages caused by the removal of the woodbark.
*1065 The court believes that in the subject case a period of three months from the date of acceptance of the contract is a reasonable length of time for the contractor to wait for final payment. The claimant is awarded interest from March 5,1961.
An award is made to the claimant against the State of New York in the total sum of $8,412.45, broken down as follows: (1) $1,529.95, the amount conceded to be due from the removal of the railroad tracks; (2) $581.10, the amount conceded to be due from the construction of drainage ditches under the railroad tracks; (3) $1,800, the sum conceded to be due for construction and maintenance of the temporary wooden railroad crossings; (4) $25 for clearing Mr. Reile’s land; (5) $3,713.08, for the delays occasioned by failure of the State to provide a job site between September 7 and September 30, 1959; (6) $484.02, for delays occasioned by failure of the State to provide a job site on September 3, 4, and October 2, 1959; and (7) $279.30, for delays occasioned by failure of the State to provide a job site on October 6, 1959 and June 11, 1960. On which total amount of $8,412.45 interest is allowed from March 5, 1961 to September 5, 1961 and from December 28, 1961 to the date of entry of judgment herein.
This claim has not been assigned or submitted to any other court or tribunal for audit or determination.
This together with the proposed findings of fact submitted to and marked by the court constitutes the written decision of the court, pursuant to OPLR 4213.