140 N.J. Super. 289 (1975)
356 A.2d 56
BUCKLEY & COMPANY, INC., A CORPORATION OF THE STATE OF NEW JERSEY, AND SCHIAVONE CONSTRUCTION CO., INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFFS,
v.
THE STATE OF NEW JERSEY; COMMISSIONER, DEPARTMENT OF TRANSPORTATION, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided July 30, 1975.
*291 Messrs. Nolan, Lynes, Bell & Moore, Attorneys for plaintiffs Buckley & Company, Inc. and Schiavone Construction Co., Inc. (Mr. Jerome M. Lynes appearing).
Mr. William F. Hyland, Attorney General of New Jersey, attorney for defendants State of New Jersey; Commissioner, Department of Transportation (Mr. Michael Fichera, Deputy Attorney General, appearing).
GAULKIN, J.S.C.
Plaintiff Buckley & Co., Inc. and Schiavone Construction Co., Inc. (Buckley/Schiavone), a joint venture, bring this action pursuant to the New Jersey Contractual Liability Act, N.J.S.A. 59:13-1 et seq., against the State of New Jersey, through the Commissioner of the Department of Transportation (Department) to recover, for itself and certain of its subcontractors, sums claimed to be due arising out of the performance of a construction contract entered into by the parties on March 28, 1967 for a project known as Route 78, Section 5U.

I. Nature of the Action and Questions Presented

The project involved construction of a section of Interstate Route 78 in the City of Newark. Described by the Department *292 as being "one of the largest and one of the most complex projects ever entered into" by it, the project centered on the confluence of U.S. Routes 1 and 9, the New Jersey Turnpike, Newark Airport and the access roads to Port Newark. The contract included road and bridge construction together with a variety of related utility, drainage, electrical and similar work. The complexity of the project lay not in the engineering or construction work itself, but rather in the planning for, and the assuring of, the continued flow of traffic in, around and through the site during construction. The contract, awarded to Buckley/Schiavone for $10,836,141.90, contemplated that the work would consume 30 months, and fixed a completion date of November 1, 1969. Various change orders entered into between the parties during and after construction extended the completion date a total of 477 days to February 21, 1971; the work was not completed until May 19, 1971, or 564 days after the scheduled completion date. The claims made here by Buckley/Schiavone on its own behalf all arise out of that delay.
Buckley/Schiavone first seeks compensation for ten different kinds of "overhead" expenses, that is, costs of equipment and personnel incurred as a result of the extended life of the project. "Overhead" equipment and personnel  including such equipment as field office and superintendent's vehicles and such personnel as job superintendents and other supervisory salaried employees assigned to the job  were not separate bid items but were allocated among the various bid items at costs based upon the anticipated life of the project. Each day that the project life was extended meant, according to Buckley/Schiavone, the continuation of those costs without compensation under the contract; such costs are distinguished by Buckley/Schiavone from production costs which are incurred only as and to the extent work proceeds.
Buckley/Schiavone further seeks recovery of additional wages paid to employees because of wage escalations which became effective after the November 1, 1969 scheduled completion *293 date. Finally, it seeks recovery of $26,100 retained by the Department pursuant to the contract as "liquidated damages" at $300 a day for the failure of Buckley/Schiavone to complete the project until 87 days after the completion date as extended by the change orders referred to above.
In defense of these claims the Department contends that certain of the delays were caused by Buckley/Schiavone itself; that the various construction problems claimed by Buckley/Schiavone did not in fact cause the delays claimed, and that all of the claims for additional costs are barred by a variety of contract provisions commonly known as "no damage for delay" clauses.
The claims made by Buckley/Schiavone on behalf of its subcontractors are of a variety of kinds, including claims for losses sustained by the subcontractors from the delays. Discussion of those claims is deferred to Part IV of this opinion.

II. The Project Delays: Findings of Fact

In order to provide for continued traffic movement to and through the various roads and facilities affected by the construction, the plans as prepared by the Department fixed a highly intricate staging procedure. The construction was fractioned into a total of 22 stages, designated Stages 1-A to 1-H, 2-A to 2-F, 3-A and 3-B, and 4-A to 4-D. For each stage the plans indicated (1) the construction work which was to proceed, (2) the portions of existing or newly constructed roadways which were to be open to traffic, and (3) the routing of traffic to and from the various roads and facilities. Construction could not proceed from one stage to another unless roadway areas needed for the planned traffic flow were available. However, the plans did not require that all work follow a rigid sequence but rather showed that certain work could be done in more than one of the stages and that certain stages could be worked, at least in part, concurrently.
*294 Some of the work, then, was critical to the progress of the job in that delay in its completion would delay commencement of the next phase and of the project as a whole, but not all of the work had that same potential effect. The factual disputes between the parties are largely as to what problems arose during the progress of the several stages and what delays, if any, can be attributed to each such problem.
To support its explanation of the causes of the 564-day delay, Buckley/Schiavone introduced its concept of the "critical path." That term is one of accepted though recent use in the construction industry. Used in the planning and bidding of projects, it designates those construction items which must be completed sequentially, indicates the maximum period of time required for each, and thus discloses the total amount of time required to complete the entire project. Although the present contract was neither prepared nor bid in terms of critical path analysis, Buckley/Schiavone at trial employed such an analysis to argue in retrospect where and why delays occurred.
The Department does not question that critical path analysis can be used to such an end, and in fact presented its own concept of the critical path. However, the parties dispute both what occurred during the course of construction and what elements of the construction were on the critical path. These disputes lead to the divergent explanations given by the parties for the delay in project completion. Their conflicting reconstructions are best evaluated by examination of the various causes of delay urged by the parties.
[The court here reviewed the evidence and reached the following conclusions as to project delays:
A. Delays in Granting Access

(1) The Fire House

Relocation of a United States Weather Bureau ceilometer delayed demolition of a fire house from *295 May 16 to May 31, 1967, and thereby delayed the project completion by 15 days.
(2) The Stulman Property

A portion of the right-of-way known as the Stulman property, as to which the contract described an anticipated vacation date of July 1, 1967, was not available until August 1, 1967, causing a 31-day delay in project completion.
(3) The Mannkraft Property

A second tract, known as the Mannkraft property but not referred to in the contract, was not available until August 2, 1967. The delay from the May 16, 1967 construction commencement date to August 2, 1967 caused a delay in the project of 79 days; this delay overlapped in part those just described.
B. Delays Resulting from Utility Work

(1) Port Street Water Line

Revision of staging plans for construction of the Port Street water line to accommodate Port Authority traffic requirements and City of Newark water supply requirements caused delay between June 15 and October 22, 1967, resulting in 129 days of project delay; this delay also overlapped in part the delays resulting from lack of access to the fire house, the Stulman property and the Mannkraft property, described above.
(2) Frontage Road Water Main

Revision of plans for the Frontage Road water main caused delay from June 14, 1967 to January 16, 1968, and the decision of the City of Newark to extend the water main at its own expense caused a further delay from March 25 to April 22, 1968. Project completion was delayed for these reasons for 89 days and 28 days, respectively.
C. Delays Resulting from Plan Errors

Errors, omissions and inadequacies in the plans prepared on behalf of the Department caused a variety *296 of delays throughout the course of the project, resulting in project delays of 190 days.
D. Miscellaneous Claims of Further Delays

The 87 days of delay for which no extension of time was granted by the Department resulted from action and inaction by both parties as well as from conditions over which neither had control, but the record provides no basis to ascribe particular portions of that delay to particular causes.]

III. Buckley/Schiavone Claims: Conclusions of Law

The parties agree that additional costs resulted to Buckley/Schiavone by reason of the delays in project completion, and they have reduced those costs to stipulated per diem amounts for each of the various kinds of costs. They are in dispute, however, as to whether any or all of those additional costs are recoverable by Buckley/Schiavone.
In defense the Department relies principally on a variety of "no damage for delay" clauses in the contract. The general no-damage clause is Article 1.7.4 of the Standard Specifications made part of the contract:
If for any reason beyond the control of the Contractor other than as provided for in Art. 1.7.3 [not here relied upon] the work be delayed, the Contractor may be granted an extension of time as provided in Art. 1.7.8, but he shall have no right to nor shall he make any claim whatsoever for damages or additional compensation by reason of the delay.
Other more specific no-damage clauses of the contract are set forth below as they become relevant.
The no-damage provisions must be construed and applied in accordance with the principles set forth in Ace Stone, Inc. v. Wayne Tp., 47 N.J. 431 (1966), and the earlier decisions in A. Kaplen & Son, Ltd. v. Passaic Housing Authority, 42 N.J. Super. 230 (App. Div. 1956); Gherardi v. Trenton Bd. of Educa., 53 N.J. Super. 349 (App. Div. 1958). See also Franklin Contracting Co. v. State of New Jersey, 134 N.J. Super. 198 (Law Div. 1975).
*297 In Ace Stone the Township of Wayne contracted with Ace Stone, Inc. as general contractor for a sewer line project. At a job meeting held prior to the execution of the contract the township engineer advised Ace Stone that it would be required to adhere to the 80-day completion date fixed by the proposed contract and directed that construction commence concurrently at three separate locations; he informed Ace Stone that all necessary easements had been acquired.
The contract was thereafter signed and Ace Stone was instructed to proceed. It organized crews and equipment and moved onto the construction site, whereupon it learned that only one of the three sites was available because the township had not in fact acquired all necessary rights of way or easements. As a result the Supreme Court found that "plaintiff was unable to conduct its operations in an orderly, continuous and economic fashion, work stoppages ensued because of the lack of easements, and the project had to be carried on through the winter months. * * *"
Following the completion of the work Ace Stone sued to recover its additional costs resulting from these delays. The trial judge granted the Township's motion for summary judgment based on the contract's no-damage clause and related provisions, as well as on the earlier cases of Kaplen and Gherardi. The Appellate Division affirmed, 89 N.J. Super. 482 (App. Div. 1965).
The Supreme Court, through Justice Jacobs, reversed and remanded the matter to the trial court for a plenary hearing. In his comprehensive discussion of no-damage clauses in general and the earlier New Jersey precedents Justice Jacobs noted that the legality of no-damage clauses "is acknowledged"; that such a clause is "generally construed strictly against its draftsman," and that "special exceptions are often read into it. * * *" 47 N.J. at 434. After discussing a number of factually apposite cases from other jurisdictions projecting such "special exceptions", Justice Jacobs concluded:
*298 Where parties enter into a construction contract with a customary no-damage clause they clearly contemplate, as Judge Goldmann pointed out in Gherardi, supra, that the contractor himself will bear the risks of the `ordinary and usual types of delay' incident to the progress and completion of the work * * * And provisions in any given contract may disclose with clarity that the parties contemplate that the contractor will even bear the risks incident to highly crucial delays such as those resulting from the public agency's failure to have the site ready. [47 N.J. at 437-438]
Justice Jacobs went on to note that the no-damage clause of the contract before the court was broad but nonspecific in its language and that parol evidence
* * * may well shed light as to whether or not the parties actually contemplated, by the no-damage clause, the barring of claims not only for ordinary delays in the course of construction, but also for delays resulting from the failure seasonably to provide rights of way. [at 438]
Accordingly, the matter was remanded to the Law Division for a full hearing to determine
* * * whether the language used in the contract by the parties, when considered in the full light of their relations and objectives, and the attendant circumstances, contemplated that the extension of time clause and the related clauses would preclude the plaintiff from asserting a claim for damages under the particular circumstances presented. [at 440]
The precedents, both within and without New Jersey, are collected in Annotation, "Validity, construction and application of no damage clause with respect to delay and construction contract," 10 A.L.R.2d 801 (1950). Although decisions in other cases are of limited utility since they largely turn on "the particular circumstances presented" (cf. Nix, Inc. v. City of Columbus, 111 Ohio App. 133, 171 N.E.2d 197, 201-202 (Ct. App. 1959)), attempts have been made to categorize the cases. In Kaplen, supra, 42 N.J. Super. 230, for instance, Judge Conford listed certain "exceptional situations" in which a no-damage clause would not bar recovery:
*299 * * * as, for example, where the delay by the public body was of a kind not contemplated by the parties, Sheehan v. City of Pittsburg, 213 Pa. 133, 62 A. 642 (Sup. Ct. 1905); where the delay was deemed to amount to an abandonment of the project, People ex rel. Wells & Newton Co. of New York v. Craig, 232 N.Y. 125, 133 N.E. 419 (Ct. App. 1921); or where the delay was caused by the active interference or bad faith of the public agency, American Bridge Co. v. State of New York, 245 App. Div. 535, 283 N.Y.S. 577 (App. Div. 1935). [at 234, 235]
Judge Goldmann in Gherardi, supra, 53 N.J. Super. 349, also discussed the applicability of a no-damage clause in terms of the various "exceptions" stated in prior cases, and such has been the approach of many cases in other jurisdictions. See, e.g., F.D. Rich Co. v. Wilmington Housing Auth., 392 F.2d 841, 843 (3 Cir.1968); Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co., 355 F. Supp. 376, 397 (S.D. Iowa 1973); Grant Construction Co. v. Burns, 92 Idaho 408, 443 P.2d 1005, 1012 (Sup. Ct. 1968).
Both Kaplen and Gherardi suggest that analyzing particular fact patterns in terms of such "exceptions" can be misleading, and Ace Stone appears to have appropriately rejected reliance on such labels and instead directed a single inquiry into the intention of the parties. Concepts such as "interference" or "bad faith" of the contractee, or "abandonment" of the contract, thus are simply considerations which bear on that ultimate determination.
In resolving that question, it must be kept in mind that, in the absence of contractual provision to the contrary, a contractor is generally held to be entitled to damages for delay resulting from a default of the contractee in the performance of his obligations under the contract. See, generally, Annotation "Right of building or construction contractor to recover damages resulting from delay caused by default of contractee," 115 A.L.R. 65 (1938). As Ace Stone suggests, a no-damage provision ought not be construed as exculpating a contractee from that liability unless the intention to do so is clear; Justice Jacobs there quoted *300 (47 N.J. at 436) with approval the following language from Pitt Constr. Co. v. City of Dayton, 237 F. 305 (6 Cir.1916):
* * * we are not aware of any sound rule or policy that would permit an employer to use such general provisions of a contract as are here found, to shield himself against damages inflicted by his own breach of a covenant made by him and of as vital a character as the present one. Assuming that he may legally do so, if an employer wishes to protect himself against his own failure to keep such covenants, he must distinctly say so; and he must advise the contractor of this purpose through specific provision set out in the contract.
For a cognate principle of contractual interpretation, see Cozzi v. Owens Corning Fiber Glass Corp., 63 N.J. Super. 117 (App. Div. 1960).
The claims for losses resulting from the various delays found above must be evaluated in the light of these premises of law and with specific reference to the various causes of delay and the relevant contract language.

A. Liability for Delays in Granting Access

(1) The Fire House

The required relocation of the ceilometer delayed the demolition of the firehouse and thus the project as a whole from May 16 to May 31, 1967. The possibility of such a delay with respect to the firehouse is specifically suggested in Article 1.2.11:
Before submitting his Proposal, the Bidder shall ascertain from the Director, Division of Right of Way Acquisition and Titles, the status of right-of-way acquisition, and of the vacation and removal or demolition of buildings on the site of the Project by other parties, and he shall ascertain the provisions of agreements between the State and property owners that may relate to his bid or to the work to be performed. The Contractor shall also confer with the said Director on the above mentioned matters immediately after award of the Contract and at such other times thereafter as may be necessary or advisable. The Contractor shall be governed by the provisions of the above mentioned right of way agreements.

* * * * * * * *
The Contractor shall make no claims for additional compensation on account of delays or necessary alterations in the procedure of *301 his work that may be caused by delays in the vacating or removal of buildings by others and the acquisition of right of way.
The following is a list of presently occupied property and the expected dates of vacation:

Demolition Nos. and/or Parcel Nos. Expected Date
 of Occupied Properties of Vacation
 D-1 15F September 15, 1966
 R 18A July 1, 1967
 18B July 1, 1967

Within the limts of parcels R 18A and 18B, Julius Stulman, as shown on Plan Sheets Nos. 15, 16 and 17 of 325, the Contractor shall defer all construction operations until July 1, 1967, unless written permission is given by the engineer to enter upon parcels R 18A and 18B prior to that date.
An extension of time, as provided in Article 1.7.8 of the Standard Specifications, will be given for any delays encountered due to nonavailability of right-of-way parcels beyond the dates listed above.
The conjoining in that single provision of the expected vacation date and an agreement of no liability for delay is persuasive evidence that the delay in access to the firehouse was a possibility contemplated by the parties. That conclusion is given further support by other provisions of the contract dealing with the ceilometer. Thus, Article 1.7.1 provides:
The Contractor shall proceed with the work of demolition of the various buildings, identified on the plans with a demolition number, as and when they become available for demolition.
If any of the buildings to be demolished are not available for demolition at the time the Contractor begins work on the Project, the Contractor shall arrange and prosecute his work so as to temporarily defer his work in the vicinity of such buildings and complete such work when the buildings are made available for demolition.
Article 1.6.11 provides:
Attention of bidder is directed to the fact that the approximate locations of known utility structures and facilities that may be encountered within and adjacent to the limits of the work are shown on the plans. The accuracy and completeness of this information is not guaranteed by the State, and the Bidder is advised to ascertain for himself all the facts concerning the location of the utilities. *302 The utilities thereafter listed included the United States Weather Bureau.
Article 6.4.4, which specifies in detail the electrical work required of Buckley/Schiavone in relocating the ceilometer, also notes:
The Contractor shall be responsible for taking and verifying all measurements and noting all conditions in the field.
In view of the understandings thus set forth, it must be concluded the parties contemplated the possibility that delay might result in obtaining access to the firehouse and in the required relocation of the ceilometer, and that the no-damage provisions were intended to apply to those eventualities. Cf. A. Kaplen & Son, Ltd. v. Passaic Housing Auth., supra. Losses resulting from that delay are accordingly not recoverable by Buckley/Schiavone, and it is therefore unnecessary to determine whether the delay was caused by any fault or breach by the Department.

(2) The Stulman Property

The losses resulting from the delay in access to the Stulman property from the anticipated July 1 date until the actual August 2 vacation date must also be found to be barred by Article 1.2.11, recited above. The contract unequivocally sets forth that the parcels were expected to be available on a certain date after the contract work commenced, and described those parcels as being "presently occupied"; and Buckley/Schiavone specifically undertook to make no claims for additional compensation for delays in the acquisition of right-of-way over these areas.
The factual situation thus presented is closely parallel to that in Kaplen, supra, where after construction commenced the contractee failed to provide access to all parts of the site in keeping with the schedule which the contract anticipated. The Appellate Division, through Judge Conford, held that the no-damage clause, similar in language to that here, unequivocally imposed the risk of loss resulting *303 from the failure to meet that schedule on the contractor:
It is entirely plain to us that in language as clear and unambiguous as could fairly have been employed for the purpose the very contingency upon which plaintiff predicates its cause of action was contemplated by the parties and that it was expressly stipulated that in such case plaintiff should have no claim for damages but only a corresponding allowance of time to complete the contract. [42 N.J. Super. at 233]
See also, Christhilf v. Mayor and City Council, 152 Md. 204, 136 A. 527 (Ct. App. 1927).

(3) The Mannkraft Property

The facts with respect to the Mannkraft property are significantly different. Here the delay occurred at the very beginning of construction; its cause, as Change Order 36 recites, was that these six parcels, not referred to in the contract, "should have been available when the contract was awarded." The contract purports to describe parcels that are "presently occupied," and the negative implication is that other necessary properties have been vacated. In short, the contract can be reasonably read as communicating that the parcels in question had already been acquired and that Stage 1-A could commence within ten days following the execution of the contract as Buckley/Schiavone was required to do. The testimony as to the discussion at the April 18, 1967 pre-construction conference that all parcels were "legally available" confirms that the Department did not disclose the facts concerning the Mannkraft property before site work actually began.
A number of cases have considered claims for damages resulting from delays in just such circumstances. In Ace Stone itself, the municipality instructed the contractor to commence work even though it had not acquired the necessary rights-of-way. Justice Jacobs there cited and discussed with apparent approval a number of cases "where the exculpatory clause was construed to be inapplicable to a situation where the contractor proceeded pursuant to the public agency's direction *304 but found that the site was not available to him because of the agency's failure to have the necessary right-of-way or easement." 47 N.J. at 435. After discussing these cases Justice Jacobs pointedly noted that (at 438) the nondamage provision in question "seems primarily pointed toward any delays which might occur after the work had begun, rather than toward any delays on the Township's part in fulfilling its implied obligation to make the necessary sites seasonably available for the commencement of work."
The numerous cases thus cited and discussed by Justice Jacobs (47 N.J. 435-438) need not be discussed again here. See Gasparini Excavating Co. v. Pennsylvania Turnpike Comm'n, 409 Pa. 465, 187 A.2d 157 (Sup. Ct. 1963); McGuire & Hester v. City and County of San Francisco, 113 Cal. App.2d 186, 247 P.2d 934 (D. Ct. App. 1952); cf. County Excavation, Inc. v. State, 44 Misc.2d 1057, 255 N.Y.S.2d 708, 711 (Ct. Cl. 1964); City of Dallas v. Shortall, 87 S.W.2d 844, 850 (Tex. Civ. App. 1935), rev'd 131 Tex. 368, 114 S.W.2d 536, 544 (Sup. Ct. 1938). They are apposite and require the conclusions that the failure to acquire the Mannkraft properties prior to the commencement of construction was not contemplated by the parties and that failure to fulfill "its implied obligations" requires that the Department compensate Buckley/Schiavone for the resultant losses. The fact that Buckley/Schiavone did not make any pre-bid inquiry as to the availability of all right-of-way as required by Article 1.2.11 does not affect the conclusion thus reached; it has properly been noted that such general clauses cannot fairly be read to supersede or render harmless the violation by the contractee of its own obligations under the contract. See, e.g., United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). Moreover, as acknowledged by the Department resident engineer Brazer and confirmed by the documentary evidence, the nonavailability of the Mannkraft properties was a matter of surprise to the Department as well as to Buckley/Schiavone, and *305 prior inquiry would have been of little utility. Cf. Sheehan v. City of Pittsburg, 213 Pa. 133, 62 A. 642 (Sup. Ct. 1905); Nix, Inc. v. City of Columbus, supra.
The conclusions thus reached do not require, however, that compensation be awarded for each day of the delay period from May 16 to August 2. As discussed above, from July 1 to August 1 the delay overlapped that caused by the failure of acquisition of the Stulman property; as shown by Change Order 36, from May 26 to June 11 it overlapped the delay caused by the test pit program; from June 15 to August 2 it overlapped the delay caused by the Port Street water line, and from May 16 to May 31 it overlapped the delay caused by the relocation of the ceilometer. For the reasons already discussed, the Department is not liable for losses resulting from the Stulman property or the ceilometer delays, and no claim is made that it is at fault for the test pit program delay; and for the reasons to be described below, the Department is not liable for losses caused by the Port Street water line. Only three days of delay  June 12 to 14  are attributable solely to the Department's default and it is appropriate to limit the recovery accordingly. Cf. Commerce International Co., Inc. v. United States, 338 F.2d 81, 89, 167 Ct. Cl. 529 (Ct. Cl. 1964); J.D. Hedin Construction Co. v. United States, 347 F.2d 235, 245, 171 Ct. Cl. 70 (Ct. Cl. 1965).

B. Liability for Delays Resulting from Utility Work

(1) Port Street Water Line

The delay found above to have arisen from the redesigning of the Port Street water line construction at the instance of the City of Newark and the Port Authority involves the following additional provisions of the contract:
Article 1.4.2:
Utility companies will be engaged in the relocation, construction, or reconstruction of their facilities within or adjacent to the limits of the project during its construction.
It is required that the Contractor familiarize himself with the work to be performed by all other contractors and utility companies *306 within and adjacent to this project. He shall coordinate his work with that of all other work forces and agencies, and cooperate with them in all matters concerning construction, reconstruction, relocation and protection of their facilities, all in accordance with the provisions of this article of the Standard Specifications. The Contractor shall make no claims for additional compensation on account of delays or necessary alterations in the procedure of his work that may be caused by the work of other contractors.
Article 1.4.3:
Suggested stage construction and maintenance of traffic are outlined in the plans. The suggested outline shall be followed unless the contractor submits an alternative method of construction and maintenance of traffic acceptable to, and approved in writing by the Engineer; except that if, due to circumstances which may arise during construction, the Engineer deems it necessary, he may revise whatever method has been accepted for use in order to meet the unforeseen circumstances. Any revision so made shall not be considered as reason for any claim for extra payment or extension of time by the Contractor.

* * * * * * * *
While work is actually being performed within the limits of any roadway that is open to traffic, the traffic in the area of such work may be restricted to a single ten (10) foot lane used alternately for each direction of traffic, and for the minimum time and distance necessary, as approved by the Engineer.

* * * * * * * *
Any restriction or diversion of traffic at any time shall be subject to the approval of the Engineer.
Article 1.7.1:
The Engineer may revise stage construction and maintenance of traffic, if deemed necessary, due to unforeseen circumstances which may arise during construction. Revisions so made shall not be considered reason for any claim for extra payment or extension of time by the Contractor.

* * * * * * * *
When possible, the construction of subsurface structures within or immediately adjacent to roadway limits shall be performed while traffic is being diverted from such areas. If traffic must be maintained in such areas, the work shall be done expeditiously in stages, *307 as approved by the Engineer, and with minimum interference with traffic.
Article 5.2.4 relating to the city water mains:
All work described or specified under these specifications will be subject to inspection, approval and final acceptance by the City of Newark, as well as approval by the Engineer, and shall be done under conditions pertaining to such work as prescribed by the Division of Water Supply, Department of Public Works, City of Newark.
Article 5.2.4:
The Contractor shall not open a continuous line of trench for more than 200 feet in advance of pipe laying and this shall be reduced to as little as 50 feet if required. However, the Engineer shall have the right to order any length of trench excavated before laying pipe. The finished grade at bottom of trench shall be prepared accurately by means of hand tools. The Contractor will be permitted to work in as many locations as City regulations will allow.
The above provisions, read in the context of this most complex construction project, clearly disclose that the parties recognized the possibility of delay arising from the necessity to accommodate the requirements and demands both of the City of Newark and the Port Authority. The language is equally clear in its communicating that the Department, through its Engineer, would have substantial discretion in overseeing and amending the planned construction operations so as to accommodate the interests and demands of the other governmental agencies. With those possibilities in mind the parties supplemented the general no-damage clause with the specific no-damage clauses of Articles 1.4.2 and 1.4.3. Inasmuch as the delay has not been shown to have resulted from any unreasonable exercise of discretion by the Department and in addition was specifically contemplated and dealt with by particularized no-damage clauses, Buckley/Schiavone is not entitled to recover for the resultant delays. Cf. Gherardi v. Trenton Bd. of Educa., supra; Wells Bros. Co. v. United *308 States, 254 U.S. 83, 41 S.Ct. 34, 65 L.Ed. 148 (1920); Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co., supra; Remo Engineering Corp. v. New York, 11 N.Y.S.2d 590 (Sup. Ct. 1939), mod. 260 App. Div. 587, 23 N.Y.S.2d 314 (App. Div. 1940), aff'd 286 N.Y. 657, 36 N.E.2d 695 (Ct. App. 1941); General Contracting & Engineering Co. v. United States, 62 Ct. Cl. 433 (1966).

(2) Frontage Road Water Main

The delay resulting from the redesign of the Frontage Road water main and the permitting of the City of Newark to extend that main along Frontage Road is governed by the same provisions recited with respect to the Port Street water line, and also Article 1.8.4:
It is understood and agreed, that the Commissioner may change the Plans so as to increase or decrease the quantities of work to be performed or materials to be furnished under the various items scheduled in the Proposal at the unit bid prices, except as otherwise hereinafter provided, and such changes will be authorized by the issuance of fully executed Change Order DC-12. The Order will show in detail the kind and quantity of work to be performed or omitted, or of materials to be furnished or omitted, the amount to be added or deducted from the Total Price bid in the Proposal for each scheduled item increased or decreased by the Order, and the number of days, if any, that will be added to or deducted from the time for completion stipulated in the Contract on account of the added or decreased work covered by the Order.
The same considerations discussed above with respect to the Port Street water line again lead to the conclusions that the change of plans here was a possibility specifically anticipated by the parties, and that the risk of resultant delay was assumed by Buckley/Schiavone. As with the Port Street water line, too, the delay, not having arisen from any breach on the part of the Department but rather by reason of a reasonable exercise of its discretion under the contract, would not generate a valid claim for damages even in the absence of the no-damage provisions. Cf. United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1957); Bruno Law v. United States, 195 Ct. Cl. 370, 383 (1964).
*309 It is also to be noted that the amendment of the plans to provide for a 24-inch main resulted in additional compensation to Buckley/Schiavone of approximately $105,000, as set forth in Change Order 30. As described therein, approximately $35,000 of that amount represented additional quantities of various bid items, but the balance of approximately $70,000 was paid under a supplemental agreement as permitted by Article 1.8.4:
It is further understood and agreed that the Commissioner and the Contractor may enter into supplementary agreements, executed on Change Order DC-12 forms, for the Contractor to furnish materials or perform work of a kind not susceptible of classification under any of the items scheduled in the Proposal. The Change Order shall state the kind and character of such work to be performed or materials to be furnished under the supplementary agreement and the amount to be paid therefor, and the number of days, if any, that will be added to or deducted from the time for completion stipulated in the Contract on account thereof.
Change Order 30 conforms precisely to the contract: it sets forth the agreement as to the supplementary work to be done and the number of days to be added to the time of completion by reason of the change of plan. The mutual undertakings of the parties thus set forth confirms that all contemplated remuneration for expenses resulting from the change was as set forth in the change order. Cf. Penjaska Tool Company, Govt. Cont. Rep., 73-2 BCA ¶ 10328 (1973); Quinn-Meissner, Inc. v. State, 268 App. Div. 936, 51 N.Y.S.2d 97 (App. Div. 1944); E.W. Foley, Inc. v. State, 61 N.Y.S.2d 118, 122 (Ct. Cl. 1946); D'Angelo v. State, 200 Misc. 657, 106 N.Y.S. 350, 356-357 (Ct. Cl. 1951).

C. Liability for Delays Resulting from Plan Errors

With respect to the 190-day delay resulting from plan errors, the following provisions of the Standard Specifications are relied upon by the Department:
Article 1.2.11:
It is the obligation of the Bidder to ascertain for himself all the facts concerning conditions to be found at the location of the *310 Project including all physical characteristics above, on and below the surface of the ground, to fully examine the Plans and read the Specifications, to consider fully these and all other matters which can in any way affect the work under the Contract and to make the necessary investigations relating thereto, and he agrees to this obligation in the signing of the Contract. The State assumes no responsibility whatsoever with respect to ascertaining for the Contractor such facts concerning physical characteristics at the site of the Project. The Contractor agrees that he will make no claim for additional payment or extension of time for completion of the work or any other concession because of any misinterpretation or misunderstanding of the Contract, on his part, or any failure to fully acquaint himself with all conditions relating to the work.
Article 1.5.2:
On the plans, figured dimensions shall govern in case of discrepancy between scaled and figured dimensions. If any discrepancy be found between the Plans and Specifications, the requirements of the Plans shall govern. If there be a discrepancy between the Standard Specifications and the Supplementary Specifications, the requirements of the latter shall govern. The Engineer shall have the right to correct apparent errors or omissions in the Plans and Specifications and to make such interpretations as he may deem necessary for the proper fulfillment of the intent of the Plans and Specifications.
The submission by the Department of plans which were imprecise and incorrect to the extent described above was unquestionably a breach of its obligations under the contract. The rule consistently recognized in the cases is well stated in Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct. Cl. 339 (Ct. Cl. 1963):
* * * plaintiff had contracted to do the work in accordance with the specifications defendant had prepared, and defendant was, therefore, under a duty not to render the project more expensive than it would have been if the contractor could have complied with the plans. In United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), the Supreme Court held that, in a case where the specifications prescribe the character, dimensions and location of the construction work, the Government implicitly warrants that the contractor, if he complies with the specifications, will be able to complete the project within the contemplated period of time. This warranty is akin to the condition implied in every *311 construction contract that neither party will do anything to hinder the performance of the other party. See J.A. Ross & Co. v. United States, supra [115 F. Supp. 187, 126 Ct. Cl. 323]; George A. Fuller Co. v. United States, 69 F. Supp. 409, 108 Ct. Cl. 70 (1947). If faulty specifications prevent or delay completion of the contract, the contractor is entitled to recover damages for the defendant's breach of its implied warranty. United States v. Spearin, supra; Warren Bros. Roads Co. v. United States, 105 F. Supp. 826, 123 Ct. Cl. 48 (1952). Those damages extend to the costs incurred by reason of the idleness resulting from the mistakes in the plans. The defendant cannot, by errors in the specifications, cause delay in plaintiff's completion of the work and then compensate plaintiff merely by extending its performance time and by payment of any added direct cost occasioned by changes to correct those errors. [at 457]
See also Luria Brothers & Co., Inc. v. United States, 369 F. 2d 701, 708, 709, 177 Ct. Cl. 676 (Ct. Cl. 1966); J.D. Hedin Constr. Co. v. United States, supra at 241; Cauldwell-Wingate Co. v. State, 276 N.Y. 365, 12 N.E.2d 443 (Ct. App. 1938).
The Department first suggests that the losses suffered by Buckley/Schiavone as a result of the faulty plans is attributable to its own failure to examine the plans as required by Article 1.2.11. Here again, however, the general clause cannot properly be read as transferring the responsibility for the defective plans to Buckley/Schiavone. See, e.g., United States v. Spearin, supra, and cases there cited. In any event, there is no evidence here that Buckley/Schiavone failed to make a reasonable inspection of the plans, and the nature of the errors  principally in computations and the mathematical date  were not such as could reasonably be expected to be discovered on a pre-bid review of these most complex plans. Cf. J.D. Hedin Constr. Co. v. United States, supra at 244; Foundation Co. v. State of New York, 233 N.Y. 177, 135 N.E. 236 (Ct. App. 1922); Fehlhaber Corp. v. United States, 151 F. Supp. 817, 138 Ct. Cl. 571 (Ct. Cl. 1957), cert. den. 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108, 78 S.Ct. 141 (1957). Indeed, the Department resident engineer acknowledged that he noted only a very few of the *312 errors in his seven-month pre-construction review of the plans and those that he did note were never communicated to Buckley/Schiavone.
The only remaining question is whether the no-damage provisions of Articles 1.2.11 and 1.7.4 immunize the Department from the losses sustained by its breach of contract. Those provisions are general in their terms and application and do not refer directly or specifically to delays caused by plan errors. Nor is there anything in the remaining provisions of this voluminous contract that in any way can be said to suggest or raise the possibility that the plans submitted by the Department may be erroneous. Where the parties did contemplate the possibility of delay they made appropriate reference thereto, as with certain right-of-way delays and delays resulting from necessary changes of plans during the course of construction, as discussed above. Surely, if they contemplated the possibility that the plans themselves would be so defective as to cause significant delay, they could and would have inserted comparable language in the contract to deal with that possibility. The parties did not do so. Rather, they both assumed, as properly they might, that the plans would be such that the work would be able to proceed. The problems which appeared did not arise out of or during the performance of the contract but resulted rather from a default of the Department at the very inception of the contract. There are simply no facts or contractual provisions here from which it can be concluded that the parties contemplated delays and losses resulting from erroneous plans.
Buckley/Schiavone is therefore entitled to recoup the losses it suffered as a result of the breach by the Department. As the court said in Cauldwell-Wingate Co. v. State, supra, where the contractor, as here, had agreed generally that it could make no claim for damages for delays:
It did not, however, by any provisions of its contract, assume the risk and loss occasioned by the act of the state, in furnishing to both these contractors misleading, imperfect and defective plans and specifications, wherein and whereby the whole scheme of foundation *313 building had to be revised, new plans and specifications adopted, and the work which was to take three weeks necessarily extended for almost a year.

* * *
The clauses in the contract, relating to delay, "in the completion of the work by any act or neglect of the State, or by changes ordered in the work," and the damage clause, have no reference to delays and damages caused, as above stated, through the direct interference and misrepresentations of the state. The delay was caused before any work was commenced, not during its performance; and, as stated, it was due to acts not within the contemplation of the parties when they were induced to make their contracts by misleading and deceptive plans and specifications. This is not a case where plans, according to which a contractor has made his bid and entered into his contract, have been subsequently changed by the architect or the state to comply with different ideas or requirements, and for which changes the contractor is to be allowed, if they cost more money. These are changes and modifications which have been occasioned by acts or failure of the state, whereby the superstructure contractor through no fault of its own, has suffered a loss. It will receive no compensation except under the act of the Legislature, chapter 701 of the Laws of 1931, which has permitted the contractor to sue the state. [12 N.E.2d at 445, 446]
See also, Seglin-Harrison Const. Co. v. State, 30 N.Y.S.2d 673 (Ct. Cl. 1941), mod. 264 App. Div. 466, 35 N.Y.S.2d 940 (App. Div. 1942); Passaic Valley Sewerage Com'rs v. Tierney, 1 F.2d 304 (3 Cir.1924).

D. Liability for Remaining Delays: Assessment of Liquidated Damages

The 87 days of delay for which no extension of time was granted have been found to have resulted from a variety of causes, including acts of commission and omission of Buckley/Schiavone and the Department, and acts and conditions over which neither had control, but, for the reasons stated above, no specific number of days of delay can be causally related to any of the individual causes. Given these facts, it is inappropriate to permit the Department to assess liquidated damages for the failure of Buckley/Schiavone to complete the project within the time fixed by the contract and the various extensions granted.
There appear to be no New Jersey cases on point (but see McClintic Marshall Co. v. Hudson Freeholders, *314 83 N.J. Eq. 539 (Ch. 1914); Van Buskirk v. Bd. of Ed., 78 N.J.L. 650 (E. & A. 1909)), but other authorities have considered questions of recoverability of liquidated damages in similar circumstances. The general rule appears to be that, in the absence of an extension of time provision in the contract, liquidated damages will be denied in their entirety where the contractee is responsible for any delay, even though some or most of the delay is attributable to the contractor. See, e.g., Gogo v. Los Angeles County Flood Control Dist., 45 Cal. App.2d 334, 114 P.2d 65 (D. Ct. App. 1941); Nomellini Constr. Co. v. Dept of Water Resources, 19 Cal. App.3d 240, 96 Cal. Rptr. 682 (D. Ct. App. 1971); Glassman Constr. Co., Inc. v. Maryland City Plaza, Inc., 371 F. Supp. 1154 (D. Md. 1974). Where the contract includes a provision for the grant of extensions of time, the authorities permit the contractee to recover liquidated damages but only to the extent that the delay is not caused by the contractee himself. The rule is stated in 5 Williston on Contracts (3 ed. 1961), 765, 766:
In building contracts, there is often inserted a provision giving the architect power to certify an extension of time in certain cases, by virtue of which the effect of a delay caused by the owner operates merely as an extension of the time for performance, and a new time is substituted for the old. In that event though the owner causes delay the builder is liable for liquidated damages, but the period of delay caused by the owner is deducted from the total delay. Unless the contract contains such a provision the delay due to each party will not generally be apportioned.
See also, Annotation, "Liability of building or construction contractor for liquidated damages for breach of time limit where work is delayed by contractee or third person," 152 A.L.R. 1349 (1944).
Application of that principle is illustrated by General Ins. Co. of America v. Commerce Hyatt House, 5 Cal. App.3d 460, 85 Cal. Rptr. 317 (D. Ct. App. 1970), where the contractor's subrogee claimed for return of liquidated damages assessed for tardy project completion. The contract *315 fixed a completion date and provided for extensions of time to be granted under certain circumstances "as the Architect may decide." There was no dispute as to the fact of delay, but the parties disputed its causes; the trial court found that the delays were caused by the contractee although not necessarily in breach of contract. The District Court of Appeals sustained the trial court's factual findings and accordingly held that liquidated damages could not be assessed even though the architect had not extended the completion time under the contract:
A party whose acts have contributed substantially to the delayed performance of a construction contract may not recover liquidated damages on the basis of such delay. [85 Cal. Rptr. at 325]
See also, Robinson v. United States, 261 U.S. 486, 43 S.Ct. 420, 67 L.Ed. 760 (1923); Peter Kiewit Sons' Co. v. Pasadena City Junior College Dist., 59 Cal.2d 241, 28 Cal. Rptr. 714, 379 P.2d 18 (Sup. Ct. 1963); Wallis v. Inhabitants of Wenham, 204 Mass. 83, 90 N.E. 396 (Sup. Jud. Ct. 1910); L.A. Reynolds Co. v. State Highway Comm'n, 271 N.C. 40, 155 S.E.2d 473 (Sup. Ct. 1967); Aetna Cas. & Sur. Co. v. Bd. of Trustees, 223 Cal. App.2d 337, 35 Cal. Rptr. 765 (D. Ct. App. 1964).
Thus, if Buckley/Schiavone were able to show with specificity the number of days of delay caused by the Department, it would not be responsible for liquidated damages for that portion of the delay. It has been able to prove that the Department's acts caused some delay but to a degree which cannot be determined. The Department itself, however, has not been able to establish the extent to which the delays were not "beyond the control" of Buckley/Schiavone so to permit the denial of a further extension of time under Article 1.7.4. Although it could persuasively be argued that the record thus justifies a conclusion that the failure of the Department to grant a further 87-day extension of time was arbitrary or grossly mistaken (see Terminal Const. Corp. v. Bergen Cty., etc., Dist. Auth., 18 N.J. 294 (1955)), *316 it is not necessary to pass on that question; the issue here is not the extension of time but the assessment of liquidated damages. Here, where both parties have been found to have contributed to the delay period and neither party can establish the extent to which the other is culpable or it is itself not culpable, neither should recover damages from the other for losses resulting from the delay. See George J. Grant Const. Co. v. United States, 109 F. Supp. 245, 246, 124 Ct. Cl. 202 (Ct. Cl. 1953); Hargrave v. United States, 130 F. Supp. 598, 602, 132 Ct. Cl. 73 (Ct. Cl. 1955); Marshall v. United States, 164 F. Supp. 221, 223-224, 143 Ct. Cl. 51 (Ct. Cl. 1958); Commerce International Co., Inc. v. United States, supra.
Accordingly Buckley/Schiavone is entitled to recover the $26,100 sum retained by the Department as liquidated damages.

IV. Claims on Behalf of Subcontractors

Buckley/Schiavone also asserts certain claims for damages for delay, additional work and monies deducted as asphalt pavement adjustments, on behalf of various subcontractors, whose subcontracts were approved by the Department pursuant to Article 1.3.7.
Buckley/Schiavone purports to bring such claims by reason of certain "liquidating agreements" entered into with the respective subcontractors on February 12, 1975, after the filing of this action but prior to trial. Buckley/Schiavone therein acknowledged its liability to the respective subcontractors in the amounts of their claims, and the subcontractors agreed to accept in full satisfaction the amounts, if any, collected by Buckley/Schiavone from the Department on such claims. Buckley/Schiavone acknowledges that in no event can it assert on behalf of a subcontractor any claim which would not be available to the general contractor in the absence of a subcontract.
In addition to disputing the merits of certain of the claims, the Department urges that all are barred by *317 the semi-final release executed and delivered by Buckley/Schiavone, and that Buckley/Schiavone in any event has no standing to sue for the benefit of its subcontractors.

A. The Semi-Final Release

Article 1.8.5 requires that a general release, in language fixed therein, be executed by Buckley/Schiavone before semi-final payment is to be made. A release in the required form, but with certain exceptions engrafted by Buckley/Schiavone in order to preserve certain claims, was executed on May 16, 1972, after the project was fully completed:

RELEASE
In consideration of the above payment we hereby release the State of New Jersey, the State Commissioner of Transportation and his agents from all claims and liabilities of whatsoever nature for anything done or furnished or in any manner growing out of the performance of the Project, except that credit will be given in the final section for the $50,000.00 retained on road and bridge and any monies due for the increased quantities that may be indicated by the As-Built survey and plans. This release applies to bridge and road. This release is given without prejudice to claims for extensions of time and additional costs, including return of liquidated damages.
In its letter of transmittal Buckley/Schiavone called attention to the fact and purpose of the amended language:
Please note that the release has been signed with the understanding that it is without prejudice to our right to subsequently submit claims for extensions of time and additional costs including the return of liquidated damages. If this procedure is acceptable, please have the Attorney General's Office acknowledge in writing that the release will not be used as a bar to such claims. If this procedure is not acceptable please return the invoice without further processing.
In response Deputy Attorney General Nardelli wrote on May 25, 1972:
* * * you are hereby advised that the release you have executed will not be used as a bar to the claims set forth in your letter. *318 The Department thereafter made payment of the semi-final estimate in the sum of $496,323.75.
Whether the release bars any or all of the subcontractors' claims is a question requiring determination of the intention of the parties; the intention is to be determined by the language used as well as by the evaluation of the situation of the parties, the attendant circumstances and the objectives that they were striving to attain. See Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301 (1953). Here the release, as edited by Buckley/Schiavone, excepts "claims for extensions of time and additional costs, including return of liquidated damages." Whatever the intended scope of that language, it does not distinguish between claims on behalf of Buckley/Schiavone itself and those on behalf of subcontractors. Inasmuch as the Department properly does not urge that the delay claims discussed above of Buckley/Schiavone itself are barred by the release, so, too, it must be concluded that the delay claims on behalf of subcontractors remain viable notwithstanding the release. Cf. Luria Brothers & Co. v. United States, supra at 710.
The release, however, must be held to bar the remaining subcontractors' claims for extra work or expense not resulting from delay. The language used by Buckley/Schiavone suggests on its face that only delay claims were intended to survive the release. The only words that arguably express a contrary intention are "additional costs," but those words take meaning from the words "extensions of time" and "including return of liquidated damages" which enclose them and which are clearly limited to delay claims. Nothing in the conduct of the parties prior to the institution of suit suggests that they regarded any nondelay claims as remaining viable. The suggestions that a mistake was made in failing to except nondelay claims, or that the release in its entirety was executed under duress, are without substance, particularly since Buckley/Schiavone drafted the exceptions to which the Department acquiesced. It is also *319 significant that only relatively modest claims, totalling approximately $16,000, were foregone. Cf. J.G. Watts Constr. Co. v. United States, 161 Ct. Cl. 801 (1963).
For the reasons thus set forth, the release executed by Buckley/Schiavone must be held to bar all claims of subcontractors other than claims for damages for delay asserted on behalf of Lightning Electric Co., Inc., Whitmyer Brothers and Gallo Asphalt Co.

B. Standing of Buckley/Schiavone to Assert Subcontractors' Claims

The Department urges that Buckley/Schiavone cannot assert any claims on behalf of subcontractors because the subcontractors are themselves barred from claiming against the Department, both under common law principles of privity and under the contract; that in any event Buckley/Schiavone is not entitled to sue in the absence of a fixed liability on its part to its subcontractors, and finally, that any recovery for the benefit of a subcontractor would be on a contract "implied in law," barred by the specific provisions of N.J.S.A. 59:13-3. There appear to be no reported New Jersey decisions passing on these issues (cf. Bedrock Foundations, Inc. v. Geo. H. Brewster & Son, Inc., 31 N.J. 124, 137 (1959)); but, except for the question of statutory interpretation, to be discussed presently, they have been resolved in a number of cases in other jurisdictions. See J. Harry McNally, Inc. v. State, 170 Misc. 914, 11 N.Y.S.2d 577 (Ct. Cl. 1939); Tully & DiNapoli, Inc. v. State, 51 Misc. 2d 11, 272 N.Y.S.2d 667 (Ct. Cl. 1966); D.A. Parrish & Sons v. County Sanitation District No. 4, 174 Cal. App.2d 406, 344 P.2d 883 (D. Ct. App. 1959); St. Paul Dredging Company v. State, 259 Minn. 398, 107 N.W.2d 717 (Sup. Ct. 1961). The cases are consistent in their holdings that a contractor may bring such claims on behalf of a subcontractor; that the lack of privity between the subcontractor and the contractee is no bar to the action, and that a liability of the contractor to the subcontractor fixed and delimited by a *320 liquidating agreement as here is a sufficient basis for the contractor to assert a claim of loss or damage.
The holdings are soundly based in reason and equity. They recognize that a direct claim by a subcontractor against a contractee is barred by concepts of privity as well as contractual provisions such as here, and that if the contractor himself is barred from asserting those claims, the contractee would be in the extraordinary position of being responsible to no one regardless of the nature or extent of its liabilities under its contract. No proper justification exists for such a result. Rather, the principle adopted by the cases is that the contractee should be responsible to the contractor for costs or damages resulting from the performance or breach of the contract, whether the contractor performed the work himself or sublet it to others. As stated by the Supreme Court of Minnesota in St. Paul Dredging Co. v. State, supra:
Plaintiff's [i.e., contractor's] contract with Morse [i.e., subcontractor] in no way absolves plaintiff from full responsibility for performance of its contract with defendant. Had plaintiff failed in this respect, defendant could have exacted from it the penalties or damages provided for in the contract * * * by the same token, plaintiff should not be barred from suing for losses occasioned by defendant's default, even though such losses were borne by Morse. [107 N.W.2d at 724]
The court went on to note that the result contended for by the contractee would not only be unjust but in violation of the apparent intent of the legislature in waiving sovereign immunity, for it
* * * would exclude Morse from bringing an action in its own name for the losses it sustained. If the state's contentions were upheld, the losses sustained in the performance of the contract occasioned by its default could not be recovered either by plaintiff or by Morse. We do not believe that * * * the legislature intended any such unjust result. [Id.]
Note also the comment of Justice Jacobs in Bedrock Foundations, Inc. v. Geo. H. Brewster & Son, Inc., supra, that, but *321 for the then bar of sovereign immunity, "much might be said in favor of the justice and equity" of permitting a contractor to seek indemnification against the State for claims asserted by a subcontractor.
It is true, of course, that no recovery may be had by any claimant for losses not sustained or not proved. A number of cases have accordingly held that a contractor is not entitled to sue on behalf of a subcontractor who is to be paid only a fixed percentage of the monies received by the contractor (see, e.g., Degnon Contracting Co. v. City of New York, 235 N.Y. 481, 139 N.E. 580 (Ct. App. 1923)), or where the contractor is otherwise under no liability to the subcontractor (see, e.g., Severin v. United States, 99 Ct. Cl. 435 (1943), cert. den. 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed.2d 1567 (1944)). But here the liquidating agreement affirms the fact and extent of liability to the subcontractor, even though it provides that the contractor will not be called upon to pay except if and as it establishes the claim as against the Department. In J. Harry McNally, Inc. v. State, supra, the New York Court of Claims found that such an agreement by the contractor and subcontractor, permitting determination of their mutual obligations by the litigation between the contractor and the State, gave the contractor standing to assert the subcontractor's claims:
Nor do the agreements for withholding suit and abiding by the determination of this court add to or subtract from claimant's [i.e., contractor's] rights here. They create no new liability. They but recognize an existing one. [11 N.Y.S.2d at 580.]
See also, Tully & DiNapoli, Inc. v. State, supra.
The same considerations render it immaterial that the liquidating agreements here were executed after suit was filed and after November 30, 1972. See N.J.S.A. 59:13-10. The suit was filed before the statutory limitation date and broadly asserted all claims of Buckley/Schiavone; the liquidating agreements do not enhance those claims but *322 simply memorialize certain of the underlying obligations for which claim is made.
It follows that the prohibition of N.J.S.A. 59:13-3 against recovery on contracts "implied in law" is not a bar to the claims on behalf of subcontractors. However uncertain may be the distinction between contracts implied in fact and those implied in law (see 1 Williston on Contracts (rev. ed.), § 18 at 39; West Caldwell v. Caldwell, 26 N.J. 9, 28 (1958)), the claims here are not based on any implied contract but on an express contract between Buckley/Schiavone and the Department; the fact that the recovery will benefit those who sustained the loss does not affect the rights and responsibilities as between the contract parties.
Buckley/Schiavone is thus entitled to assert the damages for delay claims on behalf of its subcontractors.

V. Damages

The Department is thus responsible for the additional costs resulting from the delays caused by the failure to obtain access to the Mannkraft properties (3 days) and the furnishing of inadequate and erroneous plans (190 days), or a total of 193 days. The parties have stipulated the amounts of various costs incurred by Buckley/Schiavone and the subcontractors during the 564-day extended life of the contract. Dividing each of those amounts by 564, they have arrived at per diem costs; and they have stipulated that damages shall be computed by multiplying these per diem figures by the number of days of delay for which the Department is found liable. The Department contends, however, that certain of the agreed amounts are not "overhead" items generated by the delay.
[The court here resolved the factual disputes as to damages and directed the entry of judgment in the total sum of $146,993.21, including the return of the $26,100 assessed in liquidated damages.]